Harold Z. **KAPLAN** et al., Plaintiffs,

v.

**LEHMAN BROTHERS** et al., Defendants.

Civ. A. No. 65 C 407.

United States District Court
N. D. Illinois, E. D.

Feb. 25, 1966.

———◆———

A. Bradley Eben, Joseph A. Rosin, of Chicago, Ill., for plaintiffs.

John T. Chadwell, Richard M. Keck, Luther C. McKinney, Chicago, Ill., for defendant New York Stock Exchange; Chadwell, Keck, Kayser, Ruggles & McLaren, Chicago, Ill., of counsel.

Hammond E. Chaffetz, William R. Jentes, Chicago, Ill., for defendants Lehman Bros., Goodbody & Co., Dominick & Dominick, Inc. and Paine, Webber, Jackson and Curtis; Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., of counsel.

Roger W. Barrett, William Bruce Hoff, Jr., Chicago, Ill., for defendants Lehman

Corp., One William Street Fund, and Dominick Fund, Inc.; Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.

Joseph D. Block, Chicago, Ill., for defendant Energy Fund, Inc.; Aaron, Aaron, Schimberg & Hess, Chicago, Ill., of counsel.

Edward Bullard, Charles A. Bane, Robert Hanley, Thomas L. Nicholson, Chicago, Ill., for defendant Chemical Fund Inc.; Isham, Lincoln & Beale, Chicago, Ill., of counsel.

JULIUS J. HOFFMAN, District Judge.

A seeming conflict between the federal antitrust laws and the Securities Exchange Act of 1934 is the source of this controversy. The reconciliation of these apparently opposing policies is a matter of considerable moment to the financial community and to the investing public. The point at issue is the legality of the practices of stock exchanges in fixing minimum rates for the commissions charged by stock exchange members for the purchase and sale of securities on the exchange.

The action was brought by the plaintiff Kaplan and by the plaintiff Dunn (on behalf of her minor children) as a shareholder's derivative suit and at the same time as a representative class action. The plaintiffs thus purport to sue on behalf of, and in the right of, some five corporations which are qualified as investment companies and which are generally known in the financial world as mutual funds, and to sue on behalf of their shareholders as a class. These five mutual funds are joined as nominal defendants, and include the One William Street Fund, Inc., The Lehman Corporation, Energy Fund, Inc., The Dominick Fund, Inc., and The Chemical Fund.

The actual defendants are the New York Stock Exchange (hereafter referred to as the Exchange) and four member firms of that exchange: Lehman Brothers, Goodbody & Co., Dominick & Dominick, Incorporated, and Paine, Web-

ber, Jackson & Curtis. These firms, with others, it is alleged, act as brokers and agents for the mutual funds in the purchase and sale of stocks listed on the Exchange. Jurisdiction is based upon the antitrust laws, the Securities Exchange Act of 1934, and Sections 1331 and 1337 of the Judicial Code, 28 U.S.C. §§ 1331, 1337.

The gist of the complaint is the allegation that "Since the year 1792 and up to the present time, an avowed purpose of the defendant (Exchange) has been to set and fix minimum rates of commission to be charged to the public by its members * * * on all brokerage transactions executed on the" Exchange. The constitution of the Exchange thus specifies the exact schedule of minimum commissions to be charged, and pledges all members to obedience. The Exchange polices these rates, and members who violate them are subject to expulsion. Claiming that this arrangement amounts to a combination and conspiracy in restraint of trade in violation of Section 1 of the Sherman Anti-trust Act, 15 U.S.C. § 1 et seq., and that the mutual funds have been damaged thereby in an amount equal to the difference between commission rates which have been charged under the Exchange rules and the rates that would have been available to the mutual funds "by the operation of free and open competition had no such contract, combination and conspiracy existed," a demand for judgment for three times those damages is made under the antitrust laws, and, in the same count and upon the same factual allegations, a demand for judgment for the actual damages, unmultiplied, is presented on the theory that the alleged misconduct also offends against the Securities Exchange Act of 1934. Still in the same count, the complaint prays for a declaratory judgment holding the rules of the Exchange to be null and void insofar as they prescribe minimum rates of commission, and declaring that all Exchange members are individually free to determine and set their own rates of commission.

The defendant Exchange and its member firms named as defendants have joined in a motion for summary judgment or, alternatively, to dismiss the complaint for failure to state a claim upon which relief can be granted. The parties have presented voluminous affidavits and exhibits outside the pleadings, and the Court is thereby constrained to treat the motion solely as a motion for summary judgment. Rule 12(c), Fed.R.Civ.Pro.

The opposing briefs disclose no significant disagreements between the opposing sides on the factual basis of the controversy. The affidavits present no genuine issue of material fact to be tried.

The sole question is a matter of law, appropriate for disposition on a motion for summary judgment.

I.

It is undisputed that the Exchange, by vote of its membership, has fixed the rates of commission to be charged by its members, and that those members have agreed to, and do, abide by those rates. Whether the antitrust laws forbid such price-fixing turns upon the interpretation of the Securities Exchange Act of 1934. The parties are agreed on the authoritative source of the principles which control the reconciliation of the Sherman Act and the Securities Exchange Act: the pronouncements of the Supreme Court in Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). They part company on the application of those principles to the case at hand.

In *Silver*, the plaintiff was a broker and dealer in securities but not a member of the Exchange. He made arrangements with certain Exchange members for direct-wire connections with their offices, to provide him with quotations and other information essential to his business. Under the rules of the Exchange, such direct-wire connections between members and non-members require approval by the Exchange. After tentative and temporary approval, the Exchange denied permission and the con-

nections were severed without giving notice or reasons and without affording plaintiff an opportunity to be heard. His suit for treble damages under the antitrust laws was sustained by the Supreme Court.

At the outset, the Court concluded that the Exchange was empowered to make rules on the subject of its members' connections with non-members, in order to exclude "bucket shops", "boiler shops", and similar operations. Under the statutory scheme of the Securities Exchange Act of 1934, the various exchanges are obliged to regulate themselves, subject to the surveillance of the SEC, in the interests of stability in the securities market. The exchange, in this process of self-regulation, is obliged to have rules which are "just and adequate to insure fair dealing and to protect investors." Section 6(d), 15 U.S.C. § 78f (d). Registration may be granted to the exchange only if its rules provide "for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade." Section 6(b). These broad declarations sufficed to validate exchange rules requiring approval of direct-wire connections, the court concluded.

This conclusion led to the collision of policy. "It is plain, to begin with," wrote Mr. Justice Goldberg for the majority, "that removal of the wires by collective action of the Exchange and its members would, had it occurred in a context free from other federal regulation, constitute a per se violation of § 1 of the Sherman Act." 373 U.S., at 347, 83 S. Ct., at 1252. In this circumstance, the Court unanimously concluded that such conduct could not constitute a violation, in and of itself, of the antitrust laws. In other words, the decision makes it plain that action taken by the Exchange and its members, pursuant to its statutory authority to make rules, is not illegal per se under the Sherman Act.

This basic conclusion served only as a beginning in the *Silver* case, in view of the remaining questions raised by its facts. It is the final conclusion here. The plaintiffs have cast their lot entirely upon their proposition that the fixing of minimum rates of commission through the collective action of the Exchange is illegal per se under the Sherman Act. If such action is within the authority conferred upon the Exchange by the Act of 1934, however, the direct precedent of the *Silver* decision stands squarely against them.

Since 1792, when the Exchange was founded with the so-called Buttonwood Tree Agreement, the rules of the Exchange have set minimum rates for the commissions to be charged by its members for buying or selling stocks upon the Exchange. These rules were not called into question after the adoption of the Sherman Act. In the legislative deliberations which preceded the enactment of the Securities Exchange Act of 1934, the existence of such rules was plainly in evidence and duly noted. No action was taken to outlaw the long-established practice. The securities exchange, although not a free and open market, served a public purpose by assuring investors of ready liquidation of their holdings and by affording a ready source of capital for business and industry. Congress thus chose to preserve the benefits of the exchanges, and to eliminate practices which, by undermining public confidence, might impair those beneficial functions.

The legislative means chosen to achieve these ends left the original regulating power in the exchange itself, and relied upon the SEC as the overseer empowered to protect the public interest. The Exchange was entitled to registration under the Act only if it had adopted rules which were required to be submitted to, and approved by, the SEC.

The SEC is then authorized to "alter or supplement" those rules if, after request, the exchange fails to effect specified changes on its own. Section 19(b) of the Act, 15 U.S.C. § 78s In that section, Congress enumerated twelve subjects of the exchange's rulemaking power to which the SEC's power to alter or supplement would extend, including the list-

ing of securities, hours of trading, the reporting of transactions, and "similar matters." Listed ninth among these matters for exchange rules is "(9) the fixing of reasonable rates of commission, interest, listing, and other charges." Section 19(b) (9), 15 U.S.C. § 78s.

It may be conceded that the rulemaking power thus conferred is granted in a manner which is somewhat oblique. No simple declarative sentence vests the exchange with power to fix minimum rates. Yet the power is recognized by the plainest implication. The SEC's authority to request changes in rules concerning "the fixing of reasonable rates" necessarily presupposes rules of the Exchange on that subject. If none were adopted by an exchange, the SEC could "supplement" them, after due request.

The plaintiffs seek to support their per se attack, in the face of this Congressional sanction for rate-fixing, by emphasizing the requirement that rates of commission must be "reasonable." Prescribed minimum rates, they assert, can never be "reasonable"; only free competitive rates comport with reason. The argument imputes a contradiction which would confound the plain Congressional intent, since it ignores the provision that the "reasonable" rates shall also be "fixed" rates. The requirement of "reasonable" rates must accordingly be read in the sense employed in other statutes, where the charges of public utilities are directed to be regulated and fixed at "reasonable rates." E. g., Communications Act of 1934, 47 U.S.C. § 201; Interstate Commerce Act, 49 U.S.C. §§ 1(4), 1(5), 316; Federal Aviation Act of 1958, 49 U.S.C. § 1374.

Since the plaintiffs have attacked the legality of the Exchange rules and their prescribed rates of commission solely on the ground that fixed rates are illegal, the holding in Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) is a complete bar to their claim. Rules adopted by an Exchange under the authority of the Act are not illegal per se.

## II.

In the *Silver* case, the Supreme Court went on, after holding the rules not illegal per se, to consider the remaining questions in the case. Since the power to sever wire connections with non-members could be used to eliminate competition by such a non-member as well as to serve the purposes of securities regulation by excluding unethical or irresponsible dealers, the Court conferred the right upon the non-member to a review of the justification for the termination of the direct-wire connections essential to his business. Finding that nothing in the Securities Exchange Act of 1934 gave the SEC the power to review particular adjudicative decisions of the Exchange in enforcing and applying its rules, and distinguished from review of the legislative action involved in making such rules, the Court concluded that the remedy of review must be found in the judicial branch. Since the misuse of the power to sever wire connections to injure a non-member competitor would not serve the purposes of securities regulations, there remained no policy of securities control to exclude the application of the antitrust laws or to immunize the conduct. Since the Exchange had refused to give notice or reasons or to afford a hearing to determine the justification for its action as an appropriate measure to protect the investing public, the plaintiff prevailed.

This holding adds nothing to the claim of these plaintiffs. The power to deny information to non-members of an exchange is plainly susceptible to misuse as a means to destroy competition. The power to fix rates, unlike the power to exclude, is not a weapon that can be used to injure a particular competitor. The rates, once fixed, apply equally to all Exchange members and to all customers. It is not suggested by the plaintiffs here that the rates are not uniformly applied, that the schedules are discriminatory, or that the power has been used to eliminate competition beyond that elimination inherent in any system of authorized price-fixing.

Moreover, this aspect of the *Silver* decision is expressly predicated upon the absence of SEC power to review the particular action. "Should review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to antitrust exemption would be presented." (373 U.S., at 360, 83 S.Ct., at 1258). This is the "different case", since the SEC exercises a general and continuing power to change, alter, or supplement the rules of the Exchange fixing the rates of commission. Since review is afforded within the system of securities regulation, there is no need to resort to the antitrust laws for a remedy.

The plaintiffs have complained of the rates because they are fixed. If they had complained instead that the rates were too high, they would find no support in the antitrust laws. The remedy for a level of rates that is unreasonably high rests with the SEC. Ratemaking is a matter for which the courts are ill-equipped, and accordingly a matter traditionally committed to an administrative agency. See Board of Trade of Kansas City v. United States, 314 U.S. 534, 546, 62 S. Ct. 366, 86 L.Ed. 432 (1942). The SEC since its establishment has exercised this power of review over Exchange rates of commission, and it has inaugurated a regular system of reporting from Exchange members to furnish the necessary information.

To subject the Exchange to the perils of treble liability, retroactively imposed, upon the variant decisions of different courts in determining the reasonableness of rates would inevitably disrupt the congressional plan designed to bring order to the marketing of securities. To leave the determination of reasonableness to the prospective decisions of the agency which is especially qualified and responsible for the general supervision of the industry will assure the intention of Congress as well as the interests of the public.

Judgment will be entered, accordingly, for the defendants, with costs to be assessed against the plaintiffs.