**Bernard M. BAUM, Plaintiff,**

v.

**INVESTORS DIVERSIFIED SERVICES, INC., Defendant.**

**No. 67 C 1792.**

United States District Court
N. D. Illinois, E. D.
May 17, 1968.

Donald A. Mitchell, Chicago, Ill., for plaintiff.

Milton H. Cohen, W. Donald McSweeney, and Schiff, Hardin, Waite, Dorschell & Britton, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

### Defendant's Motions to Dismiss and for a Ruling Under Rule 23

This is a purported class action brought against Investors Diversified Services, Inc. (hereinafter known as "IDS"), by plaintiffs Bernard M. Baum and Daniel S. Shulman, under Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. Sec. 13(a). Defendant has moved to dismiss the complaint for its alleged failure to state a claim upon which relief may be granted. In the alternative, and only if the motion to dismiss is denied, defendant moves, under Rule 23(c) (1) of the Federal Rules of Civil Procedure, for a determination that the suit may not be maintained as a class action.

Plaintiffs are attorneys, who sue as purchasers of shares in Investors Variable Payment Fund, Inc. (hereinafter known as "Variable Fund"), a mutual fund, whose shares are distributed exclusively by defendant. Plaintiffs have invested approximately $4,000 in shares of the Variable Fund. The suit is brought as a class action on behalf of purchasers of shares in Variable Fund and four other mutual funds whose shares IDS also exclusively distributes, including Investors Mutual Fund, Inc., Investors Stock Fund, Inc., Investors Selective Fund, Inc., and Investors Inter-Continental Fund, Inc.[1] It charges a violation of the Robinson-Patman Act, by virtue of allegedly discriminatory quantity discounts granted by IDS to certain purchasers of shares in the five mutual funds.

Essentially, the complaint sets forth the following factual allegations, which must be accepted as true, for purposes of the motion to dismiss.

Pursuant to its contract, defendant acts as the sole investment adviser and exclusive distributor for the five named mutual funds. The five funds are "open end" funds, which means that their size is limited only by the total amount of monies invested in them, and that their shares are redeemable by the issuer at the shareholder's option. See 15 U.S.C. Sections 80a–5(a) (1) and (2); 80a–2(a) (31). The funds had total net assets of $5,335,195,327, as of December 31, 1965, and have been, and still are, managed by boards of directors composed, in part, of directors affiliated with defendant within the meaning of the Investment Company Act of 1940.

The investments of the five companies are selected, supervised, and changed by such companies based upon recommendations made by defendant pursuant to separate investment advisory agreements with each of the five mutual funds. These contracts provide for the performance of investment advisory and other services by defendant for a fee which is calculated daily on the basis of the total net assets of the respective funds at the close of business each day.[2] The amount of fees payable to defendant during any period is accordingly affected by changes in the net assets of the companies, which in turn are affected principally by changes in the market prices of the securities held by the companies, and by the volume of sales of the mutual fund shares, less the amounts paid out in redemptions. During the calendar year 1965, defendant received fees totalling $19,626,366 from the five companies.

Defendant has acted as sole distributor of the shares of each of the five mutual fund companies from the time of their organization. Distribution is accomplished through a sales force consisting of approximately 4,000 nationwide representatives who exclusively

1. Shares of Investors Inter-Continental Fund, Inc., have not been offered since November 1, 1965.

2. With the exception of Investors Inter-Continental Fund, the fee for which is computed quarterly.

sell mutual fund securities of the five mutual fund companies.

A mutual fund share is a security reflecting undivided ownership in a mutual fund company. Such shares are not traded by shareholders but are redeemable upon their request. The shareholder need pay no commission upon redemption. The value of a share is determined by dividing the total number of shares outstanding into the market value of the securities held at any given point in time. Such value is deemed the "net asset value." Each share, therefore, represents an undivided interest in the total portfolio of the mutual fund company. Each share, at any point in time, has exactly the same value as any other share, and the shares themselves are fungible.

Mutual fund shares are sold by IDS at their current "net asset value," plus a sales commission or "sales load," which is based upon the amount of money invested by the customer. This "load" is graduated on a scale, which until October 15, 1964, ranged from a maximum of 7½% of the amount invested on initial purchases of less than $15,000, to 1½% on purchases aggregating $1,000,000, or over. The "load" was increased to a maximum of 8%, and decreased to a minimum of 1%, on purchases dated after October 15, 1964.[3]

Customers are permitted to take advantage of what is termed the "accumulative load" feature, meaning that once purchases by any one customer and his family, of shares of any one or combination of the funds, aggregate $15,000 or more, the next purchase receives a discount under the reduced scale of commissions which is then effective as to additional purchases. We shall refer to this feature as the "cumulative quantity discount."

The discount commission structure, and concomitantly, the cumulative quantity discount, pursuant to which commissions on sales of the various Funds' shares are calculated, constitute the crux of the complaint. Plaintiffs charge that the cumulative quantity discount is a direct discrimination in price "between investor customers of Defendant who purchase commodities of like grade and

3. The scale of commissions in effect before and after October 15, 1964, are set forth in the table below.

| Aggregate Amount of Purchases | Present Commission Rate, Represented as Percentage of Public Offering Price, Since October 15, 1964. | Former Commission Rate, Rep. as Percentage of Public Offering Price, To October 15, 1964. |
|---|---|---|
| To $14,999 | 8% | 7½% |
| $15,000 to $19,999 | 7½% | 7% |
| $20,000 to $24,999 | 7% | 6½% |
| $25,000 to $29,999 | 6% | 6% |
| $30,000 to $39,999 | 6% | 5½% |
| $40,000 to $49,000 | 6% | 5% |
| $50,000 to $74,000 | 4% | 4½% |
| $75,000 to $99,999 | 4% | 4% |
| $100,000 to $199,999 | 2½% | 3½% |
| $200,000 to $399,999 | 2% | 3% |
| $400,000 to $699,999 | 1½% | 2½% |
| $700,000 to $999,999 | 1% | 2% |
| $1,000,000 and over | 1% | 1½% |

quality. As a result of such discrimination, competition between investor customers of Defendant has been substantially lessened." [4] Plaintiff and other shareholders have assertedly been "deprived of" additional "dividends, increments of growth, and distribution of profits" by such "discriminatory" pricing, and have allegedly received a smaller number of shares than they would have received had they the benefit of the lower sales commissions charged to persons who made larger investments. Damages are sought on behalf of all shareholders in all five funds, who have paid more than the lowest percentage commission rate, allegedly totalling $450 million, after trebling under the Act.

In its motion to dismiss, defendant contends that there is no violation of the Robinson-Patman Act because mutual fund shares are not "commodities" within Sec. 2(a), and because no facts are alleged to support a probable effect upon competition as required by Sec. 2(a). Furthermore, defendant argues that cumulative quantity discounts are immune from attack under Sec. 2(a) because they have been approved by orders of the Securities and Exchange Commission, and are authorized under the Investment Company Act of 1940 (15 U.S.C. Sec. 80a–1 et seq.), and by the rules adopted by the SEC pursuant thereto.

Section 2(a) of the Robinson-Patman Act provides, in pertinent part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchasers involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly received the benefit of such discrimination, or with customers of either of them * * *."

Defendant contends that mutual fund shares are not "commodities" within the meaning of the above section. It is conceded by plaintiffs that sales of "services" and "intangibles" are exempted from the statute. Columbia Broadcasting System, Inc. v. Amana Refrigeration, Inc., 295 F.2d 375 (7th Cir. 1961), *cert. denied* 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed.2d 612 (1962) (sale of television broadcast time); Tri-State Broadcasting Co. v. United Press International, Inc., 369 F.2d 268, 270 n. 2 (5th Cir. 1966) (sale of network news service information). But they argue, mutual fund shares are tangible property and as such, "commodities" under the Act.

There is no case law which either includes or excludes mutual fund shares, or for that matter shares of stock, in or from the category of "commodities" in the Robinson-Patman Act. Plaintiffs suggest an interpretation based upon the literal understanding of the term, and essentially argue that a mutual fund share is a tangible movable article of commerce. No doubt a certificate of ownership in a mutual fund is "tangible" in the sense that it is an object "capable of being perceived, esp.(ecially) by the sense of touch." Webster's Seventh New Collegiate Dictionary, p. 901 (1965). However, plaintiffs' contention rests largely upon a semantic or dictionary interpretation of the word "commodity," and upon the definition given to "shares of stock," in several state court decisions having no relationship to the antitrust laws. E. g., People v. Federal Security Co., 255 Ill. 561, 99 N.E. 668 (1912); Pound v. Lawrence, 233 S.W. 359 (Tex.Ct.Civ.App.1921).

On the other hand, defendant cites Columbia Broadcasting System, Inc. v. Amana Refrigeration, Inc., 295 F.2d

4. Complaint, paragraph 11.

375, 378 (7th Cir. 1961), a case construing the term "commodity" as used in the Robinson-Patman Act, which rejects the propriety of an analysis based on dictionary definitions and state court decisions construing other statutes, and requires an interpretation of the "essential nature" of the matter, in the context in which it is employed. The legislative history of the Robinson-Patman amendment reveals that:

> "* * * this bill insures to the independent dealer who buys one carload, whether of groceries, dry goods, hardware or any other commodity, the same price that is given to the chain buying 10 carloads of the same goods, unless that chain can show a concrete saving in cost resulting from its method of purchase and delivery, as compared with its independent competitor." 79 Cong. Rec. 9079, June 11, 1935 (remarks of Rep. Patman.)

Representative Patman clearly emphasized the amendment's application to tangibles, such as merchandise, in the above remarks.

Plaintiffs have not demonstrated that mutual fund shares are "tangible" in any sense but the literal. Indeed, shareholders care little for the abstract value of the paper certificate which may reflect their share of ownership. For the paper itself has minimal value. It merely represents a tangible incident of the shareholder's undivided interest in the fund's ownership. The "essential nature" of a mutual fund share *certificate* is that of a piece of paper which represents ownership, and which is not the essence of the owned property itself. As recognized in Tri-State Broadcasting Co. v. United Press International, Inc., 369 F.2d 268, 270 (5th Cir. 1966):

> "* * * in this instance we think it apparent that in essence the transaction contemplates the sale of a privilege to broadcast news information, notwithstanding that incidental to such privilege is the right of appellant to utilize UPI's written news reports. Virtually no transfer of an intangible in the nature of a service, right or privilege can be accomplished without the incidental involvement of tangibles, and we conclude that in such circumstances the dominant nature of the transaction must control in determining whether it falls within the provisions of the Act. * * * Here, the dominant purpose of the transaction was not merely the purchase by appellant of tangible written news reports, but rather the valuable right and privilege of broadcasting to its listeners news supplied by a reputable news information service. In substance, the contract contemplates the sale of a service together with the privilege of vocally passing on the information supplied by that service to a radio audience.

> The news items in their printed form at best represent tangible incidents of appellant's contractual right to utilize UPI's services."

Furthermore, a reputable authority concludes that a mutual fund share itself, aside from the paper which represents it, is in substance an agreement for performance of services. As explained in Investment Companies, Mutual Funds and Other Types, p. 19, Arthur Wiesenberger & Co. (1967 ed.):

> "Mutual fund shares, as this chapter explained before, represent in effect a service contract. They are both the means of obtaining broad diversification of investment and constant supervision of it, both difficult for investors to obtain in any other way. Such additional service features as divided reinvestment and special plans further distinguish a mutual fund investment from that in ordinary securities. The cost of obtaining these extensive investment services cannot properly be compared with the cost of buying shares of an individual listed stock."

Hence, on balance, we think the essential nature of a mutual fund share

is that of a contract for the performance of services, which would not be subject to Sec. 2(a). But we really have intimated only our tentative conclusion on this issue, without exploring it in great depth. That is because it is rendered academic by the findings which we make below on the remaining issues.

One of those issues is whether plaintiffs allege an adverse effect upon competition, as is required by Sec. 2(a) of the Act. We conclude that they have not.

■ It is well settled that plaintiffs must allege facts showing reasonable probability of "an injury to competition" or the complaint will be dismissed for failure to state a claim. County Theatre Co. v. Paramount Film Distributing Corp., 146 F.Supp. 933, 934 (E.D. Pa.1956); American Oil Co. v. F.T.C., 325 F.2d 101, 104 (7th Cir. 1963). Recognizing that, the plaintiffs allege that they "have suffered an adverse effect and competitive harm by reason of unjustifiable discriminatory cumulative quantity discounts granted by defendant in the sale of mutual fund shares to others of its buyer investor customers competing with Plaintiffs." [5] But conclusory legal allegations cannot supply the factual allegations of competitive harm necessary under the Act.

■ The fallacy in plaintiffs' allegation is that they are not "competing with" other investors in the mutual funds whose shares are distributed by IDS. The Act is concerned with business competition. Its "guiding ideal", according to the Senate Judiciary Committee, was "the preservation of equal opportunity to all usefully employed in the service of distribution * * *." Rowe, Price Discrimination Under The Robinson-Patman Act, p. 20 (1962). In defining "competition" in United States v. Aluminum Company of America, 91 F.Supp. 333, 355 (S.D.N.Y.1950), the court rec-

ognized that *business* competition is what the antitrust laws are all about:

> "Commercial competition, theoretically, is the independent endeavor of two or more persons or organizations within the realm of a chosen market place, to obtain the business patronage of others by means of various appeals, including the offer of more attractive terms or superior merchandise."

Although concerned with Sec. 2(a)'s inapplicability to competition between those at different distributive levels, a number of other cases have made patently clear that relevant competition under the Robinson-Patman Act is that "between customers *competing in the distribution of the commodity.*" (emphasis added) Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1, 10 (7th Cir. 1949), *cert. denied* 338 U.S. 948, 70 S.Ct. 486, 94 L.Ed. 584 (1950); Secatore's Inc. v. Esso Standard Oil Co., 171 F.Supp. 665, 667 (D.Mass.1959); State Wholesale Grocers v. Great Atlantic & Pacific Tea Co., 202 F.Supp. 768, 773 (N.D.Ill.1961).

■ Plaintiffs are merely investors. They are not in the "business" of buying and selling mutual fund shares. They are not "competing" with their fellow investors "to obtain the business patronage of others." They care not about the identity of the other investors who deal with IDS. Their major purpose in investing in mutual funds is to secure wise investment and management of the money supplied. Certainly "customer competition" is protected by the Act, and defendants concede it. That is the very purpose of the Act, but it applies only where the customers are in competition for the business of others. That is not this case.

■ Plaintiffs have cited no case which suggests that the Act is concerned with discrimination in price to ultimate consumers or investors who are not in business competition, and this Court knows of no such case. For the Act

5. Complaint, paragraph 3.

was enacted to protect only persons in a competitive relationship with one another, and personal investors do not occupy that status. The plaintiffs and their fellow shareholders are not in "competition," and the facts alleged in the complaint could in no way establish an adverse effect on "competition" within the proscription of Section 2(a) of the Act. For this reason, the complaint must be dismissed.

A further reason exists for dismissing the complaint. Even if it contained sufficient allegations under Sec. 2(a) to overcome a motion to dismiss, which it does not, we conclude that the alleged "price discrimination" would be immune from attack under that section. That is because cumulative quantity discounts are impliedly exempted from the Robinson-Patman Act by virtue of the Investment Company Act of 1940 (hereinafter known as the "1940 Act") (15 U.S.C. Sec. 80a–1 et seq.), and the rules and regulations of the SEC enacted pursuant to it.

The 1940 Act governs the distribution of mutual fund shares issued by "open-end" investment companies. Both IDS and the mutual funds whose shares it distributes, are subject to the regulation of the Securities and Exchange Commission under the 1940 Act. The Act was enacted because of Congressional belief that the SEC should exercise regulatory control over the investment company industry. The industry's problems had been thoroughly explored and investigated in a four year study which Congress had ordered in Sec. 30 of the Public Utility Holding Company Act of 1935. The product of that study was a bill proposed by the SEC based on recommendations in its report. See 1 Loss, Securities Regulation, pp. 146–147 (2d Ed. 1961) (hereinafter known as "Loss"). After Senate hearings on the bill, the SEC and representatives of the industry agreed upon a compromise revision, which subsequently was unanimously approved, and became the 1940 Act.[6]

The essential purpose of the Act was to protect investors against malpractices in the operation and administration of publicly owned investment companies. To that end, in Section 38 (15 U.S.C. Sec. 80a–37), Congress provided the SEC with extensive regulatory authority, and the Act generally confers broad enforcement powers. The SEC has broad exemptive power under Sec. 6(c) (15 U.S.C. Sec. 80a–6(c)) of the Act, which may be exercised by order, as well as by rule or regulation. In this respect, the Act differs from the Securities Act of 1933 and the Securities Exchange Act of 1934, which provide for exemptive power, which must be exercised primarily by rule or regulation. One article has described the difference as that between "law enforcement" (1940 Act), and "law making (the 1933 and 1934 Acts). Motley, Jackson and Barnard, op. cit. supra at 1146–1147. Indeed, a concurring Justice of the Supreme Court has recognized that the Investment Company Act "passes beyond a simple 'disclosure' philosophy." SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65, 78, 79 S.Ct. 618, 625, 3 L.Ed. 2d 640 (1959) (Brennan, J. concurring). As Professor Loss has put it:

> "The Investment Company Act, like the Holding Company Act, is definitely a regulatory act for an industry which was thought to require something more than the disclosure treatment of the 1933 and 1934 acts." 1 Loss, at 144.

An article highly pertinent to the present proceedings, states the objectives of Section 22(d):

> "(1) to insure the orderly distribution of open-end investment company shares; (2) to prevent discrimination or preferential treatment in price

---

6. For discussion of the Act's history see Thomas, The Investment Company Act of 1940, 9 Geo.Wash.L.Rev. 918 (1941); Motley, Jackson and Barnard, Federal Regulation of Investment Companies Since 1940, 63 Harv.L.Rev. 1134 (1950); 1 Loss at pp. 145–147.

among members of the public, and (3) to prevent the cut-price competition which had then (prior to 1940) been making serious inroads upon the contractual distribution system of the mutual fund underwriting firms." Greene,[7] The Uniform Offering Price of Mutual Fund Shares Under the Investment Company Act of 1940, 37 U. Det.L.J. 369, 371 (1960).

■ Distribution of mutual fund shares is governed by Section 22 of the Act, and subsection (d) thereof establishes the strictures covering the pricing requirements: (15 U.S.C. Sec. 80a–22(d))

"(d) No registered investment company shall sell any redeemable security issued by it to any person except either to or through a principal underwriter for distribution or at a current public offering price described in the prospectus, and, if such class of security is being currently offered to the public by or through an underwriter, no principal underwriter of any such security and no dealer shall sell any such security to any person except a dealer, a principal underwriter or the issuer, except at a current public offering price described in the prospectus * * *."

Hence, sales of shares to the public must be made at a "current public offering price described in the prospectus."

Shortly after the Act's passage, by an opinion of the SEC's General Counsel, the propriety of "quantity discounts" (as distinguished from cumulative quantity discounts) was confirmed, so long as the varying sales commissions were described in the prospectus and uniformly available to all. That opinion stated, in pertinent part:

"I believe it is permissible to charge varying prices for varying amounts of redeemable securities based on a uniform scale of sales loads for different amounts purchased. But in my opinion, Section 22(d) requires the 'current offering price' to be one readily ascertainable by a reading of the prospectus. Therefore, I believe that the charging of varying prices is not permissible unless the prospectus definitely sets forth the price which a purchaser of any specific amount of redeemable securities will have to pay." Investment Company Act Release No. 89, March 13, 1941.

This release post-dated by five years the passage of the Robinson-Patman Amendments.

In order to obtain explicit assurance that the above opinion reflected the Commission's approval of *cumulative* quantity discounts, as defined supra, IDS subsequently sought official exemption thereof under Section 6(c) of the Act.[8] After

7. When the article was published, the author was Assistant Director of the SEC's Division of Corporate Regulation, the Division with responsibility for enforcement of the Investment Company Act.

8. Section 6(c) allows the Commission to grant exceptions from the provisions of the 1940 Act to the extent "necessary or appropriate in the public interest and consistent with the protection of investors." An exemption was necessary for the approval of *cumulative* quantity discounts for the following reason, stated by the Commission:
"Since the shares of Selective (Investors Selective Fund, Inc.), Mutual (Investors Mutual Inc.), and Stock (Investors Stock Fund, Inc.), are redeemable and are being offered currently to the public by and through the underwriter, IDS, Section 22(d) of the Act prohibits Selective, Mutual, Stock, and IDS from selling such shares to the public except at a current public offering price described in the prospectus. The proposed offers described in the above paragraphs, numbered 1 to 5 inclusive (describing the cumulative quantity discounts) even though described in the prospectus, are not deemed to be a public offering price described in the prospectus within the meaning of Section 22(d), since all of such offers are not available to all members of the public purchasing at the same time an identical number of shares of the applicant open end companies * * *" Investment Company Act Release No. 1504, August 15, 1950, pp. 4–5.

conforming to the applicable notice and hearing provisions, the SEC ordered pursuant to Sec. 6(c), "without approving sales loads imposed or proposed by the applicant companies," that the cumulative sales load schedules then in effect were "appropriate in the public interest and consistent with protection of investors and the purposes fairly intended by the policy and provisions of the Act * * *." Investment Company Act Release No. 1504, August 15, 1950.

Subsequently, when IDS organized new mutual funds Investors Group Canadian Fund, Ltd., in 1955, and Variable Fund, in 1957, it sought modification of the August 15, 1950 exemption to include the new Funds in the order. Such approval was granted respectively in Investment Company Act Release No. 2186, July 8, 1955, and Investment Company Act Release No. 2529, May 17, 1957.

In 1958, the Commission adopted Rule 22d–1, which, *inter alia*, gave even more formal approval to the use of cumulative quantity discounts in establishing sales commissions for mutual fund shares. The Rule provides, in pertinent part:

"A registered investment company which is the issuer of redeemable securities, a principal underwriter of such securities or a dealer therein shall be exempted from the provisions of Section 22(d) to the extent necessary to permit the sale of such securities by such persons at prices which reflect reductions in, or eliminations of, the sales load under any of the following circumstances:

"(a) (1) In accordance with a scale of reducing sales load varying with the quantity of securities purchased by any person. The quantity entitling any person to any such reduced sales load may be computed on any of the following bases, and may include redeemable securities of other registered investment companies having the same prin-

cipal underwriter as the issuer of such securities: (i) the aggregate quantity of securities being purchased at any one time; (ii) the aggregate quantity of securities previously purchased or acquired and then owned plus the securities being purchased; * * *.

 * * * * * *

"(2) The scale of reducing sales load and the method of computation utilized shall be specifically described in the prospectus and shall be applicable to sales to all persons." (17 C.F.R. Sec. 270.22d–1)

The reasons for allowing cumulative quantity discounts have been explained, as follows:

"Purchases of mutual fund shares made over a period of time are not, of course, a single transaction whether or not pursuant to contract. However, it would seem justifiable to accord them a reduction in sales charge if any quantity is entitled to such treatment. Whether the justification for the granting of quantity discounts is based upon trade custom or reduced selling expenses, the same reasons would apply generally to a quantity reached in a number of transactions by the same customer. One appeal that the cumulative approach has for investors is the flexibility provided in the timing of acquisitions. Additionally, investors do not have to accumulate savings over a period of time to obtain the reduced sales cost; income can be invested as received." Greene, *op. cit. supra* at 378.

The Rule reflected a desire on the part of the Commission to codify certain of its administrative interpretations of Sec. 22(d) and its prior policies in granting exemptions in the pricing area. In certain respects, not germane here, the Rule tightened up the SEC's previous interpretations of Sec. 22(d).[9]

---

9. For a general discussion of Rule 22d–1, see 1 Loss, at pp. 406–410. The instant defendant is aware of the tighter stric- tures applied to certain aspects of the Rule. See Investors Diversified Services, Inc. Inv. Co. Act Rel. 3015 (1960),

The 1966 SEC report to Congress on "Public Policy Implications of Investment Company Growth" (H.Rep. No. 2237, 89th Cong., 2d Sess.), contained an exhaustive study of industry pricing practices but did not criticize the employment of quantity discounts. Indeed, it recognized, in requiring sales of mutual fund shares at prices stated in the prospectus, Section 22(d) effectively eliminates price competition among dealers, and "is an exception to the usual congressional policy, expressed in the antitrust laws, against price fixing." SEC 1966 Report, *supra, at* p. 218.

◼ The foregoing demonstrates that the SEC has exercised its broad regulatory authority in this industry to establish a framework of pricing practices within which investment companies must operate. It has specifically approved the alleged discriminatory pricing system under attack in the case at hand, and has justified the system as being "in the public interest and consistent with the protection of investors and purposes fairly intended by the policy and provisions of this Title."

In Kaplan v. Lehman Bros., 250 F. Supp. 562 (N.D.Ill.1966), affirmed 371 F.2d 409 (7th Cir. 1967), *cert. denied* 389 U.S. 954, 88 S.Ct. 320, 19 L.Ed.2d 365 (1967) our colleague, Judge Hoffman, upheld the minimum commission rate structure established by the New York Stock Exchange, against a charge of price-fixing in violation of the Sherman Act. 15 U.S.C. Sec. 1. He found that under the Securities Exchange Act, the Exchange's authority to fix minimum commission rates, was inherently recognized by the SEC's statutory authority to "alter or supplement" exchange rules for "the fixing of reasonable rates of commission, interest, listing, and other charges." Plaintiffs argued that mini-

mum commission rates could never be "reasonable." But Judge Hoffman noted that the statute provided for the "fixing of reasonable rates." Thus he concluded, plaintiffs were arguing that the minimum commission rate structure was illegal *per se.* The contention was rejected on the basis of Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), which made "plain that action taken by the Exchange and its members, pursuant to its statutory authority to make rules, is not illegal per se under the Sherman Act." 250 F.Supp. at 564.

In *Silver*, the Supreme Court said that a proper analysis is one which attempts to reconcile the policies of the antitrust and securities laws when they conflict. It held that the antitrust laws are to be regarded as impliedly repealed with respect to Stock Exchange activities "only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." (373 U.S. at 357, 83 S.Ct. at 1257). Accordingly, the Exchange's revocation of the nonmember plaintiffs direct wire connections with member firms, an action not directly subject to Commission review, was held to be violative of the antitrust laws, since it was done without notice to plaintiffs. The Court felt that "no policy reflected in the Securities Exchange Act is, to begin with, served by denial of notice and an opportunity for hearing," and stated that the Exchange could "offer no justification under the Securities Exchange Act" for its action. However, in reaching that decision, the Court opined that rules enacted subject to Commission powers of review, are not subject to *per se* attack under the antitrust laws, since they were presumably adopted in pursuance of the policies of the Exchange Act.

It appears that the instant plaintiffs, like those in *Kaplan,* are issuing a broad-

where the SEC denied defendant an exemption from the Act which sought to continue the practice of selling to certain organizations of professional people

at reduced sales loads based upon aggregating the purchases of all members of the particular organization.

side challenge to a commission rate structure specifically approved by the SEC, in this case in Rule 22d–1 and in prior releases. Such an attack is tantamount to the *per se* attack mounted against the minimum commission rate structure in *Kaplan,* for plaintiffs do not challenge the specific schedule of rates charged as to amount, or assert a discriminatory application thereof, or the unreasonableness of the structure given the purposes and policies to be served by the 1940 Act, but attack the system of cumulative quantity discounts *per se,* as violative of the Robinson-Patman Act. It follows from *Kaplan* and *Silver* that if the exemption promulgated for those discounts was established pursuant to the Commission's statutory authority, and in the interest of advancing the policies of the Investment Company Act, it cannot be illegal *per se* under the Robinson-Patman Act. Such an exemption would have the effect of impliedly repealing that Act insofar as cumulative quantity discounts are concerned.

The inapplicability of the antitrust laws in *Kaplan,* as applied to the minimum commission rate structure established by the Stock Exchange, was based upon the regulatory powers of the Commission contained in Section 19(b) (9) of the Securities Exchange Act. Section 19 (b) (9) enumerates "the fixing of reasonable rates of commission, interest, listing, and other charges," as one of the twelve subjects of the Exchange's rulemaking power, to which the SEC's power to alter or supplement extends. This section is the source of the Exchange's power to fix minimum commission rates. Judge Hoffman found, therefore, that the setting of minimum commission rates was pursuant to the lawful authority of the Exchange as supervised by the SEC. A *per se* attack against such Exchange action had to fail according to *Silver.*

Likewise, the antitrust issue raised here is whether the system of cumulative quantity discounts, approved by the SEC, and used by virtually all mutual fund distributors, was adopted pursuant to the statutory authority of the SEC. This is precisely the extent of the legal issue posed in *Kaplan.* There is no issue beyond this, such as existed in *Silver,* where the factual situation involved a peculiar application of the Exchange's rules. Plaintiffs' superficial argument that *Kaplan* is distinguishable because it involved price-fixing and the Securities Exchange Act, rather than price discrimination and the Investment Company Act, cannot obsecure the common rationale tying *Kaplan* to the case at bar.

■ Section 22(d) of the 1940 Act is the source of the Commission's power to regulate a pricing system for mutual fund shares. Section 22(d) prohibits the sale of mutual fund shares at a price other than "a current public offering price described in the prospectus." As noted above, this section contemplates a price-fixing scheme which would constitute a per se violation of Sec. 1 of the Sherman Act, if "it occurred in a context free from other federal regulation." *Silver, supra* 373 U.S. at 347, 83 S.Ct. at 1252. The statutory language does not in the first instance, delegate to the SEC the right to set the commission rates.[10] This is left to the underwriter,

10. Section 22(a) of the Act provides that any securities association registered under the Securities Exchange Act, may adopt rules prescribing methods for computing the prices at which its members may buy, sell, or redeem mutual fund shares and the minimum time permissible between purchases and redemption. Under section 22(b), such associations may adopt rules computing the commissions which their members may take, so that the price of the open end security "shall not include an unconscionable or grossly excessive sales load." By section 22(c), the Commission is authorized to supersede with its own rules any of the rules adopted by associations under Sections 22(a) or (b). The specific rates in issue were adopted pursuant to the Rules of Fair Practice of the National Association of Securities Dealers. The Commission has not interfered with those

subject to the governing regulation of qualified securities associations. (The National Association of Securities Dealers). But pursuant to Sec. 22(c) of the Act, the SEC has power to supersede the rules governing rates adopted by the NASD. This is yet another indication of the pervasive regulatory power over commission rates exercised by the SEC, even though the SEC has not challenged the percentage commission rates set pursuant to the rules of the NASD, or the rules themselves. Plaintiffs' contention that Section 22(d) does not delegate authority to the Commission to set the amount of the sales loads,[11] however, is not only misleading (because of Sec. 22(c)), but is irrelevant to the real issue here—whether the Act authorizes the approval of a system of cumulative quantity discounts. The amount of the rates, as opposed to their varying nature, is not relevant to the issue of price discrimination within the purview of the Robinson-Patman Act.

Admittedly, the Act does not contain express language permitting the establishment of a quantity discount system. But the language certainly does not militate against permitting such discounts. The most that can be said is that the Act is silent on the subject. However, examination of the legislative history indicates that Congress probably intended to permit the use of quantity discounts. In the Senate Committee print of S. 4108, of May 28, 1940, the draft version of Section 22(d), which had been prepared by the SEC, required that sales be made at *"the* current public offering price." In response to suggestions by counsel for industry members, this was changed to *"a* current public offering price," in the Senate Committee print of June 6, 1940, to apparently make evident that a schedule of sales charges varying with the quantity purchased was permissible. National Association of Investment Companies Memorandum, pp. 3–4, June 24, 1958, SEC File No. S7–170–1. And see text at note 6, *supra.*

From that history alone, the SEC would be warranted in permitting such a system as an exercise of its supervisory powers over prices and rates under Section 22. That the Act is silent on the type of price and rate structures to be utilized, is a further sign of the pervasive regulatory control delegated to the SEC in this area by Congress.

Section 38 provides the Commission with power to make rules "as are necessary and appropriate to the exercise of the powers conferred upon the Commission elsewhere in this subchapter." And Section 6(c) confers power upon the Commission to allow exemptions "to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of this subchapter." The General Counsel's initial approval of a quantity discount system, on March 13, 1941, was based upon the proposal's compliance with the statutory requirement that the varying prices be stated in the prospectus, and reflected the Commission's belief that such a structure, if properly published in every prospectus, appropriately furthered the policies which the Commission was charged to pursue and administer under the Investment Company Act. An exemption was needed, and granted on August 15, 1950, in apparent accord with the procedural requirements of Section 6(c), to allow a system of cumulative quantity discounts.

The subsequent adoption of Rule 22d–1 was pursuant to the Commission's statutory authority as provided by Sections 6(c), 22(d), and 38 of the Act, and the content of that rule reflects the SEC's belief that the discounts are in the public interest.

As we have demonstrated, an aim of the 1940 Act was to afford the Com-

---

rates, although admittedly it could do so pursuant to its statutory authority. See 1 Loss, at pp. 403–404.

11. At p. 25 of their brief.

mission broad regulatory power in the industry, as opposed to a mere "lawmaking" role. The Commission, of course, has broad power over prices and commission rates under Section 22, both under subsection (d), and by virtue of its as yet unexercised powers in subsection (c). Its approval of cumulative quantity discounts was firmly grounded in its regulatory powers over pricing, and was procedurally accomplished by virtue of its statutory authority, as contained in sections 38 and 6(c). By its approval, the Commission has evidenced its belief that the system is in the best interests of the investing public and the industry, a concern wholly within its province. Although the system has its detractors, no less an authority than Professor Loss has concluded:

> "Very likely this uniform price system has been a material factor in the dramatic growth of the mutual funds. And it does not seem to have stifled competition, to judge from the number and variety of new entries into the industry, as well as the range of sales charges which run from 9 percent of the offering price down to 2 percent or, in the case of a few companies, zero." 1 Loss, at p. 410

Certainly, we must conclude that the SEC's approval of cumulative quantity discounts was pursuant to its duty to provide for "the orderly distribution of open-end investment company shares." Greene, *op. cit. supra* at 371.

Under the rationale of *Silver* and *Kaplan*, a challenge based upon the argument that the system is a *per se* violation of the Robinson-Patman Act, cannot succeed, since the system exists pursuant to a statutorily authorized rule of the SEC.

We find, accordingly, that the system of cumulative quantity discounts in the sale of mutual fund shares is governed exclusively by the SEC under the Investment Company Act, and is immune

from attack under the Robinson-Patman Act.[12]

For that reason, and/or for the reason that the complaint fails to allege an injurious effect upon competition, it must be dismissed. Hence, the defendant's motion under Rule 23 need not be decided.

---

12. Because of this finding, it is immaterial whether mutual fund shares constitute "commodities." Hence, our earlier statement that the latter issue is of only academic interest.