No. 197. KAPLAN ET AL. *v.* LEHMAN BROTHERS ET AL. C. A. 7th Cir. Certiorari denied. MR. JUSTICE MARSHALL took no part in the consideration or decision of this petition. *Anthony Bradley Eben* and *Peyton Ford* for petitioners. *Hammond E. Chaffetz* for respondents Lehman Brothers et al., and *John T. Chadwell* and *Richard M. Keck* for respondent New York Stock Exchange.

MR. CHIEF JUSTICE WARREN, dissenting.

This is no ordinary case. It is of utmost importance to millions of investors, and concerns practices which have an impact on the entire economy of the Nation. It presents for consideration basic principles of antitrust law not previously decided by this Court, and, consequently, is not controlled by precedent. It comes here without representation of the public interest by an agency charged with enforcement of the antitrust laws.

This case draws into question the legality under the Sherman Act of the practice of the New York Stock Exchange in adopting rules fixing minimum rates for the commissions charged by Exchange members for the purchase and sale of securities on the Exchange. Petitioners brought this action pursuant to § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, derivatively on behalf of five mutual fund investment companies of which they are shareholders and representatively on behalf of other shareholders against the New York Stock Exchange and five of its member firms. Their complaint charges that the practice of the Exchange in fixing minimum commission rates for transactions in securities listed on the Exchange constitutes a price-fixing conspiracy under § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. They sought treble damages, a declaratory judgment, and an injunction, the effect of which would be to restrain the Exchange from interfering with the rights of individual Exchange members to set their

own competitive rates of commission. The District Court granted summary judgment for the Exchange and member firms. The Court of Appeals for the Seventh Circuit affirmed.

Members of the New York Stock Exchange transact over 90% of all brokerage business in stocks in the United States. Based on the current trading volume, the investing public is now paying over $1,200,000,000 annually, at the uniform minimum rate, for the privilege of trading on the Exchange. More than 12,000,000 persons own shares listed on the Exchange. Mutual investment funds pay about $100,000,000 annually in commissions to trade on the Exchange, and over 3,000,000 persons own shares in mutual funds.

Only members can trade on the New York Stock Exchange, and its constitution severely limits membership. Exchange rules set uniform minimum commission rates to be charged by members for transactions on the Exchange. The same commission rate is charged, based on the value of the round lot (100 shares), for each transaction regardless of size; the commission on an order for 10,000 shares is 100 times that on an order for 100 shares. Exchange rules prohibit any "member, allied member, member firm or member corporation" from making "a proposition for the transaction of business at less than the minimum rates of commission." Before a member is allowed trading privileges he must sign a pledge to abide by the constitution and rules of the Exchange, and any member or allied member adjudged guilty of violating the constitution or a rule may be suspended or expelled by the Board of Governors.

This Court has long held that rates fixed by agreement are unreasonable *per se*. *United States* v. *National Assn. of Real Estate Boards,* 339 U. S. 485, 489 (1950); *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 218 (1940); *United States* v. *Trenton Potteries Co.,* 273 U. S.

392, 396–398 (1927). Therefore, the Exchange practice here attacked, just as that in *Silver* v. *New York Stock Exchange,* 373 U. S. 341 (1963), would, "had it occurred in a context free from other federal regulation, constitute a *per se* violation of § 1 of the Sherman Act." *Id.,* at 347. Here, as in *Silver,* the other federal regulatory scheme is the Securities Exchange Act of 1934, and the clear question presented is whether there is anything "built into the regulatory scheme which performs the antitrust function . . . ." *Id.,* at 358.

Section 19 (b) of the Securities Exchange Act, 48 Stat. 898, 15 U. S. C. § 78s (b), authorizes the SEC by certain procedures "to alter or supplement the rules" of the Exchange "in respect of such matters as . . . (9) the fixing of reasonable rates of commission . . . ." Respondents contend that this provision sufficiently demonstrates the SEC performs a supervisory function in respect of the Exchange's rate-fixing to exempt the practice from review under the antitrust laws. Petitioners claim that for many reasons the possibility of SEC review is an insufficient substitute for application of the antitrust laws. For example, the SEC's review of rates is discretionary. Further, the regulatory scheme fails specifically to enjoin the SEC, in determining what rates are reasonable, to "enforce the competitive standard," *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 351 (1963), and furthermore neither the SEC nor the Exchange has ever articulated any standard of reasonableness. Petitioners also claim that the underlying data used by the SEC in reviewing each of the five rate increases since 1934 have been essentially those supplied by the Exchange, and have been very limited in scope and content. Finally, they claim that if and when the SEC exercises its discretion to review rates, it is not required to hold a hearing, and because the matter is committed to the

SEC's discretion, there is no effective judicial remedy to require it to initiate a rate proceeding.

If, as petitioners claim, the regulatory scheme provides no assurance that antitrust policy will be implemented, perhaps a repeal of the antitrust law may be implied "if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." *Silver* v. *New York Stock Exchange, supra,* at 357. However, "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored." *United States* v. *Philadelphia National Bank, supra,* at 350. Moreover, petitioners claim that nothing about the Securities Exchange Act or the workings of the Exchange requires that the Exchange set minimum rates.

The court below, in a two-page opinion, held that a repeal of the antitrust laws was required to make the Securities Exchange Act work, and that "the self-regulatory function of the exchange has been exercised by virtue of § 19 (b)," 371 F. 2d, at 411. In my view, this blunderbuss approach falls far short of the close analysis and delicate weighing process mandated by this Court's opinion in *Silver*.

The importance of the New York Stock Exchange in the functioning and livelihood of this Nation cannot be gainsaid. Ever-increasing millions of persons and billions of dollars are affected by the Exchange's practices. Without expressing any final view on the merits of the controversy, I am concerned that the law on this subject is to be permitted to lie where it has aimlessly fallen by virtue of the scanty opinion below. In my judgment, the claims advanced by petitioners raise important questions not only as to the compatibility of the Exchange's rate-fixing practice with this Nation's commitment, embodied in the antitrust laws, to competitive pricing,

but also as to the fulfillment of the goal of investor protection embodied in the securities laws.

I would grant certiorari and invite the Solicitor General to participate in argument so that the public interest may be fully explored.