**THILL SECURITIES CORPORATION, etc., Plaintiff-Appellant,**

v.

**The NEW YORK STOCK EXCHANGE, Defendant-Appellee.**

**No. 18036.**

United States Court of Appeals, Seventh Circuit.

Aug. 27, 1970.

Rehearing Denied Nov. 18, 1970.

See also, D.C., 283 F.Supp. 239.

E. Campion Kersten, Arlo McKinnon, Milwaukee, Wis., for appellant; Lewis D. Thill, Elm Grove, Wis., Kersten & McKinnon, Milwaukee, Wis., of counsel.

Isaac Shapiro, William E. Jackson, New York City, Robert V. Abendroth, Milwaukee, Wis., Samuel L. Rosenberry, New York City, for appellee; Whyte, Hirschboeck, Minahan, Harding & Harland, S.C., Milwaukee, Wis., Milbank, Tweed, Hadley & McCloy, New York City, of counsel.

Before SWYGERT, Chief Circuit Judge, PELL, Circuit Judge and CAMPBELL, Senior District Judge.*

CAMPBELL, District Judge.

The basic question presented here is whether stock-brokers who are members of the New York Stock Exchange should continue to enjoy their self-acquired freedom from competition by stock-brokers who are not members. Using the vehicle of Stock Exchange rules, members seem effectively to have negated the congressionally mandated principle of competition as it would otherwise apply to them.

The New York Stock Exchange ("Exchange") is the largest organized securities market in the United States. Its dominance of the securities industry is a well known and commonly accepted commercial and historical fact. It transacts well over 70 per-cent of the dollar value of all stock transactions on exchanges in the United States. See, New

* Judge Campbell of the United States District Court for the Northern District of Illinois is sitting by designation.

York Stock Exchange, 1970 Fact Book. Its policies and practices have an ever increasing effect on our economy.

By the Exchange's Constitution, its membership is limited to 1366 members. In 1969 a membership sold for the record price of $515,000. Id. at 55.

The Exchange is governed by a 33 man Board, consisting of 29 members elected by the membership and a president and 3 governors who are to represent the public view and who are elected by the Board. The economic power of the Exchange and its members extends well beyond the operations of the Exchange itself. As the author of a leading article explains:

"The influence wielded by these Big Board members, along with their 'allied' brethren, reaches way beyond the NYSE: thus they comprise 23 of the 32 Governors of the American Exchange; 16 of 25 of the Midwest Exchange's Governors; 8 out of 11 for the Pacific Exchange; and 16 of the 22-man Board of the National Association of Securities Dealers, a 'self-regulatory institution for the over-the-counter markets' to which, since it bars any of its members 'from dealing with a non-member broker or dealer except at the prices * * * accorded to members of the public', for 'all practical purposes the vast majority of brokers or dealers' must belong 'in order to engage profitably in most underwritings and over-the-counter business'. Quite understandably, then, it is on the operations of the NYSE and its members that antitrust interest has so far principally focused." Bicks, Antitrust And The New York Stock Exchange, 21 Bus.Lawy. 129, 134 (1965).

In many respects the Exchange has been delegated governmental authority. Its counsel describes it as a "unique self regulator." Under the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) it may adopt its own constitution and rules, and discipline violations thereof. The Securities Exchange Commission ("SEC") has the power, however, to order changes in Exchange rules respecting a number of subjects, set forth in section 19(b) of the Act.[1] 15 U.S.C. § 78s(b). Except for the limited review authority of the SEC, the Exchange's economic power in the securities field appears complete and absolute.

Plaintiff Thill Securities Corporation, ("Thill") is a licensed securities dealer-broker, registered with the Securities and Exchange Commission, and a member in good standing of the National Association of Securities Dealers, Inc., but is not a member of the New York Stock Exchange. It brings this action on its own behalf and on behalf of all other securities dealers and brokers similarly situated, being those who are not members of the New York Stock Exchange and who are denied access to the auction market and trading facilities of the Exchange except through one of its members. In its complaint Thill charges the Exchange with substantial anti-competitive conduct in violation of the antitrust laws of the United States. Sherman Antitrust Act, § 1 and § 2, 15 U.S.C. § 1 and § 2; and Clayton Act, § 4, 15 U.S. C. § 15. Specifically, Thill charges that the Exchange has engaged in an unlawful and unreasonable combination and conspiracy in restraint of interstate trade and commerce and has unlawfully and unreasonably monopolized the securities market in the United States by among other things adopting, subscribing and adhering to a rule which prohibits any member of the Exchange from sharing any commission earned from the purchase or sale of securities with a non-member, even though the non-

---

1. There appears to be considerable doubt that the SEC has power to alter, amend or supplement Exchange rules dealing with any subject not specifically enumerated in section 19(b). See, Bicks, Antitrust And The New York Stock Exchange, 21 Bus.Lawy. 129, 137 n. 42 (1965).

member may have furnished the order;[2] and by discriminately discouraging customers and prospective customers of Thill and other non-members from doing business with non-members.

Thill alleges that as a proximate result of the unlawful and monopolistic rules and practices of the Exchange, it and other non-members of the Exchange are totally deprived of commissions or other fair compensation on transactions which they have initiated and serviced. It further alleges that the intended, necessary and actual effect of this unlawful conduct is to restrain trade by preventing any competition by and between members of the Exchange and non-member securities dealers and brokers. Thill alleges to have suffered damages in the amount of seven million dollars, for which it seeks treble damages ($21,000,-000) under the antitrust laws. It also seeks a declaratory judgment that the Exchange's prohibition against sharing of commissions constitutes a violation of the antitrust laws; and an injunction prohibiting the Exchange from enforcing the prohibition. Subsequent to the filing of this action, Thill Securities Corporation went out of business.

The defendant Exchange does not contest the anti-competitive effects of its rule prohibiting the sharing of commissions—sometimes referred to as the anti-rebate rule. At oral argument its counsel admitted, as is obvious, that the conduct complained of would constitute a violation of the antitrust laws, were those statutes applicable to the activities of the Exchange in this case. Its position is

that the Sherman Act does not apply to the rule of the Exchange prohibiting the sharing of commissions by members with non-members. It contends that this broad immunity is enjoyed by virtue of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) which authorizes registered national securities exchanges to adopt rules in respect to the "fixing of reasonable rates of commission" subject to review and revision by the Securities Exchange Commission under section 19(b) of the Act. 15 U.S.C. § 78s(b). It also contends that the SEC has and is exercising exclusive review jurisdiction over such rules of the Exchange, and that its conduct is thus immune from antitrust liability. This immunity, in its view, extends beyond the "fixing of reasonable rates of commission" and includes rules relating to the "sharing" of commissions, because the prohibition against sharing of commissions with non-member broker dealers is an integral part of the "fixing of reasonable rates".

The district court essentially agreed with the position taken by the Exchange. It first found that the conduct complained of, i. e. the prohibition against the sharing of commissions, was one method of regulating commission rates, and as such was subject to review by the SEC under section 19(b); and that the SEC is exercising its section 19(b) power of supervision over the commission structure.

The district court then concluded that the "challenged Exchange practice, being within the scope and purpose of the 1934 Act, does not constitute a *per se* violation

2. Article XV, § 1 of the Constitution of the New York Stock Exchange provides in part:
   "Sec. 1. Commissions shall be charged and collected upon the execution of all orders for the purchase or sale for the account of members or allied members or of parties not members or allied members of the· Exchange, of securities admitted to dealings upon the Exchange and these commissions shall be at rates not less than the rates in this Article prescribed; and shall be net and free from any rebate, return, discount or allowance made in any shape or man-

ner, or by any method or arrangement direct or indirect. No bonus or percentage or portion of a commission, whether such commission be at or above the rates herein established, or any portion of a profit except as may be specifically permitted by the Constitution or a rule adopted by the Board of Governors, shall be given, paid or allowed directly or indirectly, or as a salary or portion of a salary, to a clerk or person for business sought or procured for any member or allied member of the Exchange or member firm or member corporation."

of the antitrust laws", and that it would not be proper to inquire into the reasonableness of the Exchange's prohibition as "the SEC is currently exercising its supervisory duty over this area of Exchange self-regulation". Accordingly, the court found no genuine issue of any material fact and entered summary judgment for the Exchange. Plaintiff Thill then took an appeal to this court.

In our consideration of the issues presented in this appeal we must begin with the teachings of the Supreme Court in Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). The controversy in *Silver* arose from the Exchange's unilateral direction to certain of its member firms to discontinue private wire connections with the plaintiff non-member broker-dealer. This conduct, as the Supreme Court noted in its opinion, had it occurred in a context free from other federal regulations, would constitute a *per se* violation of section one of the Sherman Act. Because the activities of the Exchange are at least in part subject to the regulation of another statutory scheme, the Securities Exchange Act of 1934, the Court was confronted with the issue as to whether the Securities Exchange Act, which created a duty of Exchange self regulation, constituted an implied repealer of the antitrust laws, thereby exempting the Exchange from liability. Upon consideration of the question, the Supreme Court soundly rejected any notion that the Exchange enjoyed blanket immunity from the enforcement of the antitrust laws simply because its activities were to a certain extent subject to the regulatory provisions of the Securities Exchange Act. On the contrary, the Court concluded that the proper approach is an *analysis* which reconciles the operation of both statutory schemes (the antitrust laws and the Securities Exchange Act) with one another rather than holding one completely ousted. In undertaking the analysis to attempt to reconcile the two statutes, courts were admonished that repeal or ouster of antitrust laws is not favored.

"The Securities Exchange Act contains no express exemption from the antitrust laws or, for that matter, from any other statute. This means that any repealer of the antitrust laws must be discerned as a matter of implication, and '[i]t is a cardinal principle of construction that repeals by implication are not favored.' United States v. Borden Co., 308 U.S. 188, 198 [60 S.Ct. 182, 188, 84 L.Ed. 181]; see Georgia v. Pennsylvania R. Co., 324 U.S. 439, 456–457 [65 S.Ct. 716, 725–726, 89 L.Ed. 1051]; California v. Federal Power Comm'n, 369 U.S. 482, 485 [82 S.Ct. 901, 903, 8 L.Ed.2d 54]. *Repeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary.* This is the guiding principle to reconciliation of the two statutory schemes." (Emphasis supplied, 373 U.S. at 357, 83 S.Ct. at 1257)

Despite these admonitions the Exchange argues, as the court below concluded, that the antitrust court's analysis ends once it is determined that the conduct complained of, here the antirebate rule, is subject to potential review by the SEC under section 19(b).

This conclusion is said to follow from the reasoning of this court in Kaplan v. Lehman Brothers, 371 F.2d 409 (1967); affirming Kaplan v. Lehman Brothers, 250 F.Supp. 562 (N.D.Ill.1966), which concerned the Exchange's practice of fixing minimum rates of commission. That case was brought by certain shareholders in several mutual funds who charged that the practice of the Exchange in fixing minimum commission rates constitued a price fixing conspiracy in violation of section one of the Sherman Act. 15 U.S.C. § 1. In granting summary judgment for the defendants in that case, the district court stressed the fact that the plaintiffs there had attacked the rules and the prescribed rates solely on the theory that the fixing of minimum rates of commission through the collective action of the Exchange was illegal *per se* under the Sherman Act. The court then

correctly observed that as in *Silver* the conduct challenged, had it occurred in a context free from other federal regulation, would constitute a *per se* violation of section one of the Sherman Act. 373 U.S. at 347, 83 S.Ct. 1246, 10 L.Ed.2d 389. But, because of the presence of the other statutory scheme, namely the Securities Act, the conduct was not illegal *per se* but rather called for an analysis, "which reconciled the operation of both statutory schemes." Accordingly, the court held as a matter of law that the *per se* attack could not stand.

On appeal, this court affirmed and in a very brief (2 page) opinion expressed agreement with the district court's "holding that the antitrust laws are inapplicable to the New York Stock Exchange insofar as its prescribing of minimum commission rates is concerned." 371 F.2d at 411.

The court below read *Kaplan*, both the opinions of the district court and this court, as holding that because the subject of commission rates is subject to SEC review under section 19(b) of the Securities Act, it is not subject to antitrust attack, *per se* or otherwise. Premised on this reading of *Kaplan* the district court concluded that the bar against commission sharing, being an "integral part of commission rate structure" was likewise immune from antitrust attack, *per se* or otherwise.

■ In reviewing the lower court's determination in this cause, we first observe that the district court correctly stated in its opinion that in *Silver*, the Supreme Court held that anti-competitive conduct by the Exchange, not subject to review by the SEC, may be reviewed by an antitrust court. It further opined, however, that the Supreme Court "intimated" that a different result, i. e. antitrust immunity, would follow where the conduct complained of was subject to SEC review. We disagree, as we find in the teachings of *Silver*, no "intimation" that the mere possibility of SEC review wraps the conduct of the Exchange in an impregnable shield of antitrust immunity. In our opinion this interpretation

completely disregards the firm directive in *Silver* that "Repeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." 373 U.S. at 357, 83 S.Ct. at 1257. In our view, *Silver* teaches that a reconciliation of the two statutory schemes is not foreclosed simply because the Securities Act and the review jurisdiction of the SEC may touch upon the activity challenged under the antitrust laws. As the Court in *Silver* pointed out, the New York Stock Exchange's constitution and rules are permeated with instances of regulation of member relationships with non-members, including non-member broker dealers, and that in meeting its public trust established by the Securities Exchange Act of 1934, the Exchange may properly adopt rules governing the relations of its members with non-members. That general power to adopt rules relating to the relations of its members with non-members, however, does not in and of itself place the application of such rules outside the reach of the antitrust laws. Rather it is at this point that the analysis of reconciliation really begins.

■ Before the investing public of the United States may be deprived of the benefit of competition through the vehicle of Exchange rules, it must be established that the Exchange's exemption from the antitrust laws is necessary to discharge its responsibilities under the Securities Exchange Act. See Baxter, NYSE Fixed Commission Rates: A Private Cartel Goes Public, 22 Stan.L.Rev. 675, 689 (1970); Nerenberg, Applicability of the Antitrust Laws to the Securities Field, 16 West.Res.L.Rev. 131 (1964); Johnson, Application Of Antitrust Laws To The Securities Industry, 20 S.W.L.J. 536 (1966); Comments of the United States Department of Justice, filed before the Securities Exchange Commission Inquiry into New York Stock Exchange Proposals to Permit Public Ownership of Member Corporations, SEC release No. 8717. In short, its exemption must be based on a showing of true necessity. As applicable

here, it must be established that subjecting the antirebate rule to antitrust attack will frustrate the purpose of the Securities Exchange Act or make it substantially ineffective. "Otherwise, the benefits of competition, acknowledged by Congress, would be sacrificed needlessly." United States v. Third National Bank in Nashville, 390 U.S. 171, 189, 88 S.Ct. 882, 893, 19 L.Ed.2d 1015 (1968).

In the record before us there is no evidence, save for the allegations of plaintiff, as to the effects of the anti-competitive conduct complained of; there is no evidence as to the extent to which the challenged rule is subject to actual review by the SEC; there is no evidence as to what in the regulatory scheme "performs the antitrust function"; and, most notably, there is no evidence as to why the antirebate rule must be preserved as "necessary to make the Securities Exchange Act work." In sum, this record falls woefully short of the meticulous analysis called for in *Silver*.

As to the district court's reliance on the opinion of this court in Kaplan v. Lehman Brothers, we find essential distinctions between that case and the case presently before us. The most obvious distinction is that in *Kaplan* the plaintiffs argued only that the minimum commission rate structure was illegal *per se*. This contention directly contradicts the rationale of *Silver*, which made, "plain that action taken by the Exchange and its members, pursuant to its statutory authority to make rules, is not illegal *per se* under the Sherman Act." *Kaplan*, 250 F.Supp. at 564.[3] In this case Thill does not contend that the anti-rebate rule of the Exchange is illegal *per se,* but asks for the application of a rule of reason. See Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

To further distinguish the cases, we recite the following comments of the trial court in *Kaplan*, relating to the anticompetitive conduct there complained of. In distinguishing *Silver* the court stated (at 565):

"The power to deny information to non-members of an exchange is plainly susceptible to misuse as a means to destroy competition. The power to fix rates, unlike the power to exclude, is not a weapon that can be used to injure a particular competitor. The rates, once fixed, apply equally to all Exchange members and to all customers. It is not suggested by the plaintiffs here that the rates are not uniformly applied, that the schedules are discriminatory, or that the power has been used to eliminate competition beyond that elimination inherent in any system of authorized price-fixing."

The power to refuse to share commissions with certain non-members is "plainly susceptible to misuse as a means to destroy competition." It is a weapon "that can be used to injure a particular competitor." The rates once fixed, apparently do not "apply equally to all." (See pp. 815–816, infra). And, it is "suggested by plaintiffs here that the rates are not uniformly applied," are discriminatory, and that the "power has been used to eliminate competition."

While we are of the opinion that the distinctions between this case and *Kaplan* firmly support the result we reach here, we should note that the district court could have been misled by the abbreviated rationale of this court in *Kaplan*, particularly by the statement that, "the antitrust laws are inapplicable to the New York Stock Exchange insofar as its prescribing of minimum commission rates is concerned." 371 F.2d at 411. This statement apparently could imply a broader immunity than is warranted by the teachings of *Silver*. See Baxter, NYSE Fixed Commission Rates: A Private Cartel Goes Public, 22 Stan.L.

---

3. See also Baum v. Investors Diversified Services, Inc., 286 F.Supp. 914 (N.D. Ill.1968), where a similar conclusion was reached in a *per se* attack under the Robinson Patman Act against the pricing practices under the Investment Company Act of 1940. Aff'd 409 F.2d 872 (7th Cir. 1969). The district court there likewise interpreted *Kaplan* as involving a *per se* attack only.

Rev. 675, 690 (1970); Johnson, Application Of Antitrust Laws To The Securities Industry, 20 S.W.L.J. 536, 558–9 (1966); Note, Monopolies—Immunity From Antitrust Liability—Minimum Commission Rates Of Stock Exchanges, 19 Case Wes.Res.L.Rev. 167 (1967). It was such an interpretation that obviously impelled the sharp criticism of this court's opinion by Chief Justice Warren when he dissented from the Supreme Court's denial of Certiorari in *Kaplan*. The Chief Justice discussed the importance of the issues presented in the case and complained that the substantial allegations of the plaintiffs were never afforded the hearing called for in *Silver*.

"The court below, in a two-page opinion, held that a repeal of the antitrust laws was required to make the Securities Exchange Act work, and that 'the self-regulatory function of the exchange has been exercised by virtue of § 19(b),' 371 F.2d, at 411. In my view, this blunderbuss approach falls far short of the close analysis and delicate weighing process mandated by this Court's opinion in *Silver*.

"The importance of the New York Stock Exchange in the functioning and livelihood of this Nation can not be gainsaid. Every-increasing millions of persons and billions of dollars are affected by the Exchange's practices. Without expressing any final view on the merits of the controversy, I am concerned that the law on this subject is to be permitted to lie where it has aimlessly fallen by virtue of the scanty opinion below. In my judgment, the claims advanced by petitioners raise important questions not only as to the compatibility of the Exchange's rate-fixing practice with this Nation's commitment, embodied in the antitrust laws, to competitive pricing, but also as to the fulfillment of the goal of investor protection embodied in the securities laws." 389 U.S. 954 at 957–958, 88 S.Ct. 320, 19 L.Ed.2d 365.

Even the "broad language" of *Kaplan*, however, does not go so far as the Exchange now would urge. It argues that potential review by the SEC vests that agency with exclusive jurisdiction over the subject to the exclusion of the antitrust court. The lower court, at least in part, adopted this theory finding that it would not "be in the interest of making the 1934 Act work" to undertake "an inquiry into the reasonableness of the Exchange's prohibition or to apply the antitrust laws to the challenged practice." In so finding the court stressed that the, "SEC is currently exercising its supervisory duty over this area of Exchange self regulation, and I am of the opinion that such supervision constitutes more than adequate review and control of the Exchange practices." This conclusion, relating to the adequacy of the SEC's review, was apparently based on the fact that the SEC has from time to time reviewed and approved the rate structure of the Exchange and more particularly on May 28, 1968 the SEC announced the commencement of an investigation and public hearing to consider changes in the rules, policies and practices of all exchanges respecting commission rate structure. The announcement published by the SEC listed "Economic Access to the Exchange Market by Non-Member Broker Dealers" as one of the matters to be inquired into. These hearings are still in progress. From these limited facts the court concluded, "It thus appears clear that the SEC has and is currently exercising its § 19(b) duty of supervision over the Exchanges' commission structure".

As we observed above, there is no evidence in the record that the SEC is exercising actual and adequate review jurisdiction under the Act. Furthermore, even the fact that the SEC may be exercising its proper supervisory power over the rules of the Exchange does not in and of itself cloak the Exchange with antitrust immunity for its conduct relating to those rules. Of course it is not disputed that in exercising its review power under section 19(b), the SEC, like other regulatory agencies, may weigh and consider antitrust factors. See The

Rules of The New York Stock Exchange, 10 S.E.C. 270 (1941).

But, that fact does not vest the Commission with primary responsibility for the enforcement of competition as mandated by Congress in the antitrust laws. United States v. First National Bank and Trust Co. of Lexington, Ky., 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962).[4] These cases, particularly the *Philadelphia National Bank* case, squarely reject the Exchange's contention that the court's inquiry must end once it is established that its rules were adopted pursuant to its duty of self regulation under the 1934 Act and are subject to SEC review.

In *Philadelphia National Bank,* a merger of two large banks in the Philadelphia area was approved by the Comptroller of the Currency pursuant to the Bank Merger Act of 1960. Under the Act the Comptroller is required to consider the effect on competition in passing on merger applications. And, before granting approval under the Bank Merger Act, the Comptroller received reports from the Attorney General and from other government agencies as to the effect of the merger on competition. Despite the Comptroller's statutory approval, the Justice Department attacked the merger as a violation of section 7 of the Clayton Act. 15 U.S.C. § 25. In resisting the attack, the banks argued that because the Bank Merger Act directed the Comptroller to consider competitive factors before approving mergers, any merger so approved was immunized from challenge under the antitrust laws. In rejecting this contention, the Supreme Court observed that, "No express immunity is conferred by the Act", and that, "Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored". 374 U.S. at 350, 83 S.Ct. at 1734, citing a legion of cases including Silver v. New York Stock Exchange.

In our view the facts here are much stronger in favor of application of the antitrust laws than were those in the *Philadelphia Bank* case. In reviewing the rules of the Exchange the SEC is not required to consider their effect upon competition. On the contrary, its history in reviewing rules adopted by the Exchange indicates a reluctance to do so. It has been suggested that the SEC has never, "forcibly altered an Exchange's commission rate structure, and there is little to indicate that it has even thoroughly investigated proposed rate revisions". Note: Monopolies—Immunity From Antitrust Liability—Minimum Commission Rates Of Stock Exchanges, 19 Case Wes.Res.L.Rev. 167, 173 (1967). In the *Kaplan* case discussed in detail above, it was alleged without contradiction that the underlying data used by the SEC in reviewing each of the five rate increases since 1934 have been essentially those supplied by the Exchange, and have been very limited in scope and content. See dissenting opinion of Chief Justice Warren, 389 U.S. at 956, 88 S.Ct. at 321.

---

4. These and numerous other cases referred to in the Court's opinion in United States v. Philadelphia National Bank, hold that repeal of antitrust laws in regulated industries is to be implied only where necessary to permit the agency to fulfill its statutory function. Repeal has been found in only a few cases where the regulatory body has been granted specific broad and detailed authority over rates, service offerings and market areas and where it has been granted express antitrust exemptions for agency approved transactions. Even under these circumstances the exemptions have been limited. See, for examples of the exemptions and their limits, Georgia v. Pennsylvania Railroad Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), and 49 U.S.C. §§ 5 par. (11), 5(b) (railroads and trucking); Carnation Company v. Pacific Westbound Conference, 383 U.S. 213, modified 383 U.S. 932, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), and 46 U.S.C. §§ 813(a), 814 (shipping); Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) and 49 U.S.C. § 1384 (airlines).

Legal writers have also been critical of the SEC's passive supervision of the Exchange. One has described the SEC as a "tame watchdog", as a result of which "self-regulation has come to mean, at least to the industry and particularly to the New York Stock Exchange, that the SEC will observe a rather passive role, leaving the industry to govern itself in its own wisdom." Jennings, Self-Regulation in the Securities Industry; The Role of the Securities and Exchange Commission, 29 Law and Contemp.Prob. 663, 664–5 (1964). See also, Note: Antitrust And The Stock Exchange, Minimum Commission or Free Competition, 18 Stan.L.Rev. 213 (1965).

Parenthetically, and by way of expressing our agreement with the Supreme Court's policy of strictly limiting all antitrust exemptions in deference to regulatory bodies, we also note that the history of United States regulatory agencies in general seems usually to record an ever growing absence of the spirit required for vigorous enforcement of the antitrust laws. Rather, it seems to demonstrate that shortly following the establishment of administrative procedures the regulatory agency usually becomes dominated by the industry which it was created to regulate.

Perhaps Congress had this possibility in mind when it strictly limited the powers of the regulatory agencies to enforce the antitrust laws. Insofar as the securities industry is concerned, it is clear that Congress did not intend to exempt that industry from antitrust liability when it passed the Securities Exchange Act. United States v. Morgan, 118 F.Supp. 621 (S.D.N.Y.1953). Their purpose in passing the Act and the primary responsibility of the SEC thereunder is to protect investors. It is in this area of public protection that the SEC claim their expertise. On the other hand, it should be remembered that the courts of the United States have over the years become the repository of antitrust expertise. Congress and our Supreme Court have directed the courts to employ this expertise unless the court in a given case concludes that its employment will frustrate the goals of the regulatory scheme. As we have indicated herein, no such conclusion is justified in this case, at least not at this stage of the proceedings—before any evidence has been offered to support the proposition that judicial interference with the Exchange's antirebate rules will frustrate the goals proposed by the Securities Exchange Act.

In remanding this cause to the district court where this inquiry may be pursued, we think it appropriate to note certain observations that have occurred to us in reviewing the record and in considering the arguments of both parties in this complex case.

Most important, before a court may abdicate its jurisdiction on the antitrust issue the defendant must establish its anticompetitive conduct as justified because it is necessary for the operation of the Securities Act.

We further note from our review of the transcript of proceedings below in certain portions not included in the Appendix (pages 3–5, 22–23, 30–33, of proceedings of November 15, 1968) that the district court inquired at the commencement of defendant's argument in support of its motion for summary judgment, as to whether factual evidence would be necessary to decide this case and if so, what type of evidence.

Counsel for plaintiff suggested to the court that expert testimony would be required to establish, if possible, that the conduct complained of was necessary to make the Securities Act work. We agree and offer the further suggestion that it seems particularly appropriate in a case of this nature for the court to invite the participation, by way of expert testimony and legal argument, of the government agencies so vitally interested in the issues before the court—the SEC and the Department of Justice.

We make the further observation, without prejudging the issue, that it is difficult to conceive how the Exchange can on remand argue that the antirebate rule is "necessary to make the Act work"

when its members have gone to imaginative extremes to circumvent the rule when it serves their private economic purposes to do so. It appears from all we can read on the subject that the rule is honored much more in its breach than in its observance, as through various devices, member firms routinely share commissions or the equivalent with favored non-member brokers. One writer, after first discussing the business considerations that require member and non-member co-operation, explains the system as follows:

"To accommodating these obvious member and nonmember interests, the principal hurdle is the Exchange ban on 'any rebate, return, discount or allowance' off the NYSE rate schedule.

"It is to get around this antirebate hurdle that a variety of reciprocal business and special service arrangements have emerged. Highlighting typical reciprocity deals, a member may place 'business on a regional exchange with a nonmember who is a member of that exchange even though * * * the member is also a member of the regional exchange * * * and could have placed the business there directly or * * * the security is traded on the NYSE as well as the regional exchange' so that the member could have just as well done the business at home. And where an over-the-counter dealer is to be the recipient of member favor, the member may deal through the nonmember even though the member's trading department could itself have effected the transaction. As the ratios for such *quid pro quo's* become formalized, oft' times in the area of $1 in commission to the nonmember for every $2 or $3 he produces for a member, these devices become little more than arrangements for commission splits—condoned so long as they are based simply on the member's hope that he can secure return business'. Much this same goal of recompense for past or lure for future nonmember favor can also be served by the member's performance

on advantageous terms, of a gamut of 'special services: installation and maintenance of wire services, clearance of non-Exchange transactions, office space, special research, and promotional materials and displays.' Here, again, under Exchange construction of its rules, some 'nominal charge' for such 'services' can convert a 'prohibited rebate into a permissible arrangement.'" Bicks, Antitrust and the New York Stock Exchange, 21 Bus. Lawy. 129, 146–147 (1965).

See also, Jennings, Self-Regulation in the Securities Industry: The Role of the Securities and Exchange Commission, 29 Law and Contemp. Prob. 663, 688–9 (1964); Nerenberg, Applicability of the Antitrust Laws to the Securities Field, 16 West.Res.L.Rev. 131, 148 (1964); Comment, The Minimum Commission System And The New York Stock Exchange, 38 Ford.L.Rev. 84, 85–6 (1969) Note, The Application of Antitrust Laws To The Securities Industry, 10 Wm. & Mary L.Rev. 136, 160–2 (1968).

Concern over these practices has also been expressed by the President of the Exchange (Letter of President Robert W. Haack to Members of the Exchange, January 2, 1968), and by the SEC (Director Irving M. Pollack to all national exchanges, July 18, 1966, and Report of the Special Study of the Securities Markets, 1963).

It is also important to note that other national stock exchanges manage to make the Act work without need of the antirebate rule.

Finally, and apart from the antirebate rule, the complaint below raised additional issues which were not considered by the district court when it granted defendant's motion for summary judgment. Specifically, Thill alleges that the Exchange has engaged in unfair advertising practices aimed at undermining public confidence in the competence and reliability of non-member broker-dealers. It also alleges that members, through the benefit of the antirebate rule, pirate customers of non-members by assuring them

that they can operate less costly than non-members because the non-member must tack on some commission for his services. Such allegations of predatory practices in such a vital industry clearly require more than summary dismissal and should be fully considered on remand.

Accordingly, the cause is reversed and remanded to the district court for full proceedings consistent with the conclusions herein.

SWYGERT, Chief Judge (concurring).

In the main I concur in Judge CAMPBELL'S excellent treatment of the difficult problems of conflict between antitrust and securities laws presented in this case.

In my view the appeal presents only one question: whether Congress, by the enactment of the Securities Exchange Act of 1934, intended to exempt rules promulgated by The New York Stock Exchange from the general competitive principles contained in the antitrust laws and to place exclusive jurisdiction over those rules in the Securities Exchange Commission. For the reasons set out below, I agree with Judge Campbell that Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), although not directly in point, provides sufficient guidance to hold that the district court erred in ruling that Article XV, § 1 of The New York Stock Exchange Constitution (the antirebate rule) is exempt from attack under the antitrust laws.

Two additional questions exist in this case which are not before us in this appeal: (1) whether the doctrine of primary jurisdiction requires that the anticompetitive aspects of an exchange rule be considered in the first instance by the SEC; and (2) whether the antirebate rule violates § 1 and § 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. Both questions are exceedingly difficult and require careful consideration by the district court. Although we may indicate relevant lines of inquiry on remand, I believe our function as an appellate court is best fulfilled by eschewing consideration of the merits of these questions.

I

Defendant argues that the antirebate rule is exempt from antitrust attack if it is within the scope of the exchange's duty of self-regulation and subject to the SEC's power of review and revision under section 19(b) of the 1934 Act.

This position is not compelled by Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). In that case plaintiff, a nonmember broker, alleged that defendant unlawfully deprived him of private telephone wire connections to municipal bond and corporate securities departments of member firms by means of an *ex parte* order issued by The New York Stock Exchange to certain of its members. Although the Exchange's power to terminate wire connections with nonmember brokers was implicit in its constitution and rules, Silver v. New York Stock Exchange, *supra* at 354–55, nn. 9 & 11, 83 S.Ct. 1246, 10 L.Ed.2d 389, the Supreme Court chose to treat plaintiff's complaint as challenging a particular instance of exchange action. When so viewed the Court ruled that defendant had violated the Sherman Act. Its holding may be summarized as follows. (1) The action of the Exchange would be a per se violation of the Sherman Act unless immunized by the Securities Exchange Act of 1934, Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Fashion Originator's Guild v. FTC, 312 U.S. 457, 61 S. Ct. 703, 85 L.Ed. 949 (1941). (2) The rules applied by the Exchange were "germane to performance of the duty implied by § 6(b) and § 6(d) [of the 1934 Act] to have rules governing members' transactions and relationships with nonmembers." Silver v. New York Stock Exchange, *supra* at 356, 83 S.Ct. at 1256. As a result the action of the defendant was not a per se violation. (3) Nevertheless, repeal of the antitrust laws by the enactment of the 1934 Act "is to be

regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." *Id.* at 357, 83 S.Ct. at 1257. (4) The aims of the 1934 Act offer no justification for "self-regulation conducted without provision for some method of telling a protesting nonmember why a rule is being invoked * * * and allowing him to reply in explanation of his position." *Id.* at 361, 83 S.Ct. at 1259. For this reason the Court held that the conduct of the defendant violated the Sherman Act.

Defendant argues, however, that our decision in Kaplan v. Lehman Bros., 250 F.Supp. 562 (N.D.Ill.1966), aff'd, 371 F.2d 409 (7th Cir.), cert. denied, 389 U.S. 954, 88 S.Ct. 320, 19 L.Ed.2d 365 (1967), by resolving a question expressly reserved in *Silver*, adopts the rule which it advances. Thus defendant emphasizes that the Court in *Silver* noted that, "[s]hould review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to antitrust exemption would be presented." Silver v. New York Stock Exchange, *supra* at 360, 83 S.Ct. at 1259. It argues that the *Kaplan* case held the exchange rule governing minimum commission rates exempt from the Sherman Act on the ground that section 19(b) of the 1934 Act provides agency review of exchange self-regulation through authority of the SEC "to alter or supplement the rules of * * * [an exchange] in respect of such matters as * * * (9) the fixing of reasonable rates of commission, interest, listing and other charges."

I agree with Judge CAMPELL that defendant reads the *Kaplan* case too broadly and that it stands only for the limited proposition that the Exchange's minimum commission rate rule was not a per se violation of the Sherman Act. I further concur with his view that the Supreme Court would apply the holding of *Silver* to exchange rules as well as to a specific application of those rules and that SEC supervision under section 19 (b) is insufficient to place exclusive jurisdiction over exchange rules in the SEC. In reaching this conclusion I would reject defendant's argument that the absence of discussion of the anticompetitive aspects of exchange rules in the legislative history of the 1934 Act constitutes implied repeal of the antitrust laws for rules within the domain of exchange self-regulation. This argument seems especially weak in light of the Maloney Act, 15 U.S.C. §§ 78 a-hh, enacted in 1938, which expressly provides for consideration by the SEC of anticompetitive practices in analogous regulation of registered securities associations. Thus the availability of SEC review of exchange self-regulation under section 19(b) is, in my view, irrelevant to the scope of exchange exemption from the antitrust laws. However, for reasons discussed below, I believe the existence of this review *is* relevant to a determination of whether the SEC possesses primary jurisdiction over exchange rules.

For these reasons I agree that this case must be remanded for fresh consideration of whether the antirebate rule violates the Sherman Act. It is clear that this rule would constitute a per se violation of that law unless immunized by the 1934 Act. Further, the district court correctly held that the antirebate rule is within the Exchange's duty of self-regulation. Thus, the court on remand will be faced with only one question: whether the antirebate rule is necessary to make the 1934 Act work. As to the resolution of this issue I, of course, express no views.

II

I differ with Judge CAMPBELL'S excellent opinion only insofar as it can be interpreted as deciding that the SEC does not possess primary jurisdiction to consider the anticompetitive aspects of exchange rules. I believe this question lurks in the background of this case and lies at the heart of proper resolution of conflicting antitrust and securities law considerations present in this appeal. See generally Baxter, NYSE Fixed Commission Rates: A Private Cartel Goes

Public, 22 Stan.L.Rev. 675, 683–689 (1970). The history of the proceedings below indicates that the issue of primary jurisdiction was never considered. Thus, defendant moved for summary judgment on the sole ground that exchange rules were within the exclusive jurisdiction of the SEC and exempt from antitrust attack. I believe the district court decided defendant's motion on this basis even though the court did refer to presently pending proceedings before the SEC to support its holding on exclusive jurisdiction. For the reasons that follow I am convinced that the issue of primary jurisdiction is not resolved by prior cases. Therefore, on remand the district court may consider this issue prior to a decision on the merits of plaintiff's complaint.

The issue of primary jurisdiction was not reached in Silver v. New York Stock Exchange, *supra,* since the Court interpreted plaintiff's complaint as challenging a particular application of an exchange rule, a matter over which the SEC was without jurisdiction. There the Court stated: "[The 1934 Act] does not give the Commission jurisdiction to review particular instances of enforcement of exchange rules. * * * This aspect of the Statute * * * obviates any need to consider whether petitioners were required to resort to the Commission for relief before coming into court. * * *" *Id.* 373 U.S. at 357–358, 83 S.Ct. at 1257. In footnote 12 the Court indicated that a different result might obtain if exchange self-regulation were subject to SEC jurisdiction and ultimate judicial review. As a result the existence of primary jurisdiction by the SEC to consider the anticompetitive aspects of exchange rules is a question of first impression in this case.

Cases concerning primary jurisdiction of other administrative agencies to consider antitrust matters do not provide clear guidance for resolution of this question. Compare, Pan American World Airlines, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); California v. FPC, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962). Such cases demonstrate that the existence of primary jurisdiction depends upon consideration of numerous factors concerning agency jurisdiction and expertise. Therefore, in resolving this issue the following questions, among others, might be considered on remand: (1) whether and to what extent the SEC is empowered to consider antitrust laws and policy in fulfilling its duty of review of exchange self-regulation; (2) whether an aggrieved party may initiate SEC review of exchange rules under the provisions of the Securities Exchange Act or the Administrative Procedure Act; (3) whether and to what extent SEC expertise would be useful in resolving, in the first instance, the question of whether a given rule is necessary to make the Securities Act work; and (4) whether the anticompetitive aims of the Sherman Act can be achieved without subjecting the exchanges to treble damage suits which necessarily result if the doctrine of primary jurisdiction is unavailable to the defendant in this case. These issues have not been briefed in this appeal and I decline to attempt their resolution at this time.

PELL, Circuit Judge (concurring in part and dissenting in part).

While I concur in the majority's determination to remand this cause for further proceedings, I find it necessary with respect to the scholarly and analytical opinion of Judge CAMPBELL to dissent with regard to the scope of the further proceedings ordered.

In my opinion, the "fixing of reasonable rates of commission * * * and other charges" as provided for by § 19 (b) (9) of the Securities Exchange Act of 1934 (15 U.S.C. § 78s(b) (9)) necessarily includes as an ancillary power the prohibition of rebates. The practice of rebates in the field of securities undoubtedly might well involve antitrust considerations if the jurisdiction in the area had not been placed by Congress in the Securities and Exchange Commission. But, in my opinion, it has been so placed.

A scheme or pattern of fixing commissions would seem to me to involve as an integral part thereof control of the matter of possible rebates. As of the present time, that control has been exercised by a prohibition of any rebates.

I would therefore eliminate from further proceedings in this case the matter of the Exchange rule *per se,* being in my opinion controlled by Kaplan v. Lehman Brothers, 250 F.Supp. 562 (N.D.Ill. 1966), 371 F.2d 409 (7th Cir. 1967), cert. denied, 389 U.S. 954, 88 S.Ct. 520, 19 L.Ed.2d 365 (1967).

My opinion in this respect is buttressed by the fact that the very matter in issue is now under consideration by the SEC which on May 28, 1968 announced investigation and public hearings on rate structure matters including economic access to the Exchange market by non-member broker-dealers.

It would seem inappropriate, in my opinion, for this court, or the court below, to attempt to determine the reasonableness of the Exchange prohibition against commission sharing, which the SEC has the power to modify if not consistent with the purposes of the 1934 Act.

The matter of the place of antitrust regulation where a regulatory agency is involved has frequently been before the courts. See the comments of Judge Leventhal in concurring, Cities of Slatesville v. AEC (D.C.Cir.1969).

To paraphrase the language of Judge Leventhal, it is a fair synthesis of these cases that a statute providing for licensing or other regulation is presumed to permit consideration of antitrust principles, with the harmonizing of diverse and even competing principles, unless a contrary intent appears expressly or by necessary implication. No intent to disregard the antitrust principles appears in the Securities Exchange Act of 1934.

However, the plaintiff here as contrasted to *Kaplan* does not rely solely on the claimed illegality of the antirebate rule but further alleges in effect that if the rule were valid the practices engaged in are violative of antitrust principles. Particular reference was made to various sophisticated devices whereby favored non-members had the practical effect of rebates. This matter as well as those referred to in the next to last paragraph of the majority opinion created genuine issues of fact which should have precluded a summary judgment.

I also must respectfully question the majority's observation regarding lack of diligence on the part of regulatory agencies enforcing antitrust laws and succumbing to the domination of the industry which they were created to regulate. If it be a fact that there is an apparent lack of diligence this may consciously have been a result reached in balancing diverse public interests. However that may be, I do not have any basis in fact on which to concur in the observation.

It is also to be noted that the parties agree that the SEC may not award damages. It has been held in an analogous situation that under these circumstances even though injunctive relief might be denied, damages could be pursued in the court proceedings. S. S. W. Inc. v. Air Transport Ass'n of America, 89 U.S.App. D.C. 273, 191 F.2d 658, 663 (1951).

For the reasons hereinbefore set out I would reverse and remand but would limit the issues as hereinbefore indicated although in so doing I do not purport, as I am sure the majority did not purport, to suggest what the district judge's determination could be after hearing the evidence which will be adduced.