498 F.2d 1303
 Fed. Sec. L. Rep. P 94,619, 1974-2 Trade Cases 75,148
 Richard A. GORDON, Individually and as President of
Independent Investors Protective League, and unincorporated
association, and in behalf of the membership thereof and in
behalf of all persons similarly circumstanced, Plaintiff-Appellant,
v.
NEW YORK STOCK EXCHANGE, INC., et al., Defendants-Appellees.
 No. 1045, Docket 74-1043.
 United States Court of Appeals, Second Circuit.
 Argued June 5, 1974.
Decided June 28, 1974.
 
 I. Walton Bader, New York City (Bader & Bader, New York City, on the brief), for plaintiff-appellant.
 William E. Jackson, New York City (Milbank, Tweed, Hadley & McCloy, Lord, Day & Lord, Brown, Wood, Fuller, Caldwell & Ivey, New York City, on the brief, Isaac Shapiro, Mark L. Davidson, John J. Loflin, James B. May, New York City, of counsel), for defendants-appellees.
 Seymour H. Dussman, Atty., Dept. of Justice, Washington, D.C. (Thomas E. Kauper, Asst. Atty. Gen., on the brief), as amicus curiae urging reversal.
 Lawrence E. Nerheim, Gen. Counsel, Securities Exchange Commission, Washington, D.C. (Walter P. North Associate Gen. Counsel, Frederic T. Spindel, Sp. Counsel, Theodore L. Freedman, Washington, D.C., Atty., on the brief), as amicus curiae urging affirmance
 Before KAUFMAN, Chief Judge, and MANSFIELD and MULLIGAN, Circuit judges.
 IRVING R. KAUFMAN, Chief Judge:
 Whether the minimum rate structure presently employed by the nation's stock exchanges enjoys immunity from attack under the antitrust laws is a question of such importance that we need not belabor its significance. The Supreme Court in Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), although subjecting the application of an exchange rule to antitrust scrutiny, acknowledged that if there were Securities Exchange Commission (SEC) jurisdiction to review a challenged rule, a different case would arise concerning antitrust exemption. We are here presented with that different case.
 ( 1) The complaint itself provides all the facts necessary for our disposition. Richard A. Gordon brought this private antitrust action on April 2, 1971, on his own behalf and for a purported class of small investors, against the New York Stock Exchange, Inc. (NYSE), the American Stock Exchange, Inc. (Amex), and two representative member firms of the exchanges,[1] alleging that the exchanges' fixed minimum commission system violated the Sherman Act, 15 U.S.C. 1 and 2 (1970), and the Robinson-Patman Act, 15 U.S.C. 13(a) (1970). More specifically, we read Gordon's complaint to have alleged: (1) that the exchange rules providing for a volume discount from the minimum commission rate in the case of large transactions, together with negotiated rates only on portions or orders in excess of $500,000,[2] and the interim surcharge on transactions involving less than 1000 shares,[3] amounted to a system of price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. 13(a) (1970),[4] and the Sherman Act, 15 U.S.C. 1, 2 (1970); and (2) that the fixed commissions charged those unable to avail themselves of negotiated rates constituted a scheme of price-fixing, contrary to the provisions of the Sherman Act, 15 U.S.C. 1, 2 (1970).[5]
 Without reaching the merits of Gordon's principal claims, the district court found the challenged practice of fixing commission rates not within the jurisdiction of an antitrust court since judicial oversight of this particular aspect of exchange self-regulation had been displaced by the review power vested in the SEC under 19(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. 78s(b) (1970). Accordingly, the district court granted the defendants' motion for summary judgment, and dismissed the complaint.[6] For the reasons set forth below, we agree.
 Since Gordon's other claims are essentially frivolous,[7] we turn directly to his principal allegation that the exchange practice of fixing commission rates violated the Sherman Act. Any analysis of the interrelation of the antitrust laws and the system of supervised exchange self-regulation embodied in the 1934 Act must begin with Silver v. New York Stock Exchange,373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). The Court was there asked to decide whether the NYSE's enforcement of an exchange rule without notice or hearing, resulting in the removal of a nonmember's private telegraph wires from members offices-- concededly a group beycott-- was subject to antitrust scrutiny. Seeking to achieve the requisite accommodation between the antitrust laws and the 1934 Act's policy of exchange self-regulation, Mr. Justice Goldberg, speaking for a majority of the Court, formulated the following test:
 
 
 1
 Repeal (of the antitrust laws) is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary.
 
 
 2
 373 U.S. at 357, 83 S.Ct. at 1257.
 
 
 3
 In Silver, the Court concluded that exercise of its antitrust jurisdiction was proper for two reasons. Because there was no possibility of SEC review of the challenged act-- disconnection of Silver's wires to member offices-- assertion of judicial oversight would have resulted in no conflict, between agency and court, rendering cumbersome and inconsistent the system of administrative regulation. 373 U.S. at 358, 83 S.Ct. 1246. Moreover, denial of antitrust jurisdiction on the facts presented in Silver would have left no governmental body to perform the antitrust function of preventing an injury to competition which could not be justified as furthering legitimate self-regulatory ends. Id. at 358-361, 83 S.Ct. 1246. Though the Court hinted that some breathing space should be left the exchange for unsupervised self-regulation, if found inexcusable the failure to provide the procedural safeguards of notice and hearing. Id. at 361-367, 83 S.Ct. 1246.
 
 
 4
 The instant case, of course, is toto caelo different from Silver, for there is here governmental oversight of the fixing of commission rates, vested expressly in the SEC pursuant to 19(b)(9) of the 1934 Act, 15 U.S.C. 78s(b)(9) (1970). And, as we have indicated, the Silver Court recognized that a 'different case' would be posed if the exchange practice allegedly violative of the antitrust laws were subject to control by the SEC. Although the Silver rationale might well authorize us to ground our holding here on the existence of SEC review power, we do not rely upon that authority alone to support a finding of antitrust immunity. Rather, we are of the view that both the language and the history of the 1934 Act, together with the sound policy behind supervised exchange self-regulation, mandate the conclusion that Congress intended to exempt from the antitrust laws the exchange practice of fixing commission rates.
 
 
 5
 Section 19(b) of the 1934 Act states, in pertinent part:
 
 
 6
 The Commission is further authorized, if after making appropriate request in writing to a national securities exchange that such exchange effect on its own behalf specified changes in its rules and practices, and after appropriate notice and opportunity for hearing, the Commission determines that such exchange has not made the changes so requested, and that such changes are necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange, by rules or regulations or by order to alter or supplement the rules of such exchange (insofar as necessary or appropriate to effect such changes) in respect of such matters as . . . (9) the fixing of reasonable rates of commission, interest, listing, and other charges . . .
 
 
 7
 It is clear from this language that the 'congressional aim in supervised self-regulation is to insure fair dealing and to protect investors from harmful or unfair trade practices,' Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414 U.S. 117, 130, 94 S.Ct. 383, 391, 38 L.Ed.2d 348 (1973). It is equally plain that Congress considered the 'fixing of reasonable rates of commission' to be essential to meeting these goals, for it listed this factor explicitly among the twelve items so denominated. Finally, and most importantly for this jurisdictional dispute between an antitrust court and the SEC, Congress vested in the Commission the power to determine whether changes are 'necessary' in the exchanges' rate-fixing practices to assure fulfillment of the goals of the Act. Accordingly, Congress defined in 19(b) those matters fundamental to achieving 'the aims of the Securities Exchange Act,' Silver v. New York Stock Exchange, 373 U.S. at 361, 83 S.Ct. at 1259, and accorded the SEC the authority to make whatever changes respecting those matters are 'necessary or appropriate' (19(b)) to effectuate those aims-- i.e., in the terms of the Silver test, 'necessary to make the Securities Exchange Act work.' 373 U.S. at 357, 83 S.Ct. at 1257.
 
 
 8
 If the discussion in Silver of a core of exchange self-regulation necessary to make the 1934 Act work, and thus immune from application of the antitrust laws, is to be given any meaningful application, we are of the view that it must have reference to the practices enumerated in 19(b), and in this instance to the fixing of reasonable rates of commission. The Supreme Court also recognized in Silver that the exercise of antitrust jurisdiction, where it conflicted with a power of review expressly delegated to the SEC, could render ineffective the supervised self-regulatory scheme designed to accomplish the aims of the 1934 Act. 373 U.S. at 358-361, 83 S.Ct. 1246. Frustration of those aims would be the inevitable consequence of duplicative or inconsistent standards announced contemporaneously by courts and Commission.
 
 
 9
 That Congress intended Commission-supervised exchange self-regulation to be of central importance in the scheme of the 1934 Act is emphasized by the legislative history of the Act. Both House and Senate reports stress the broad responsibility left with the exchanges to administer their own affairs. H.R.Rep.No.1383, 73d Cong., 2d Sess. 15 (1934); S.Rep.No.792, 73d Cong., 2d Sess. 13 (1934). The grant of this unique self-regulatory power, however, was conditioned upon the creation of the SEC, invested with broad discretionary powers equal to the complex and changing nature of the problems arising in the securities industry. Cf. H.R.Rep.No.1383 at 6-7. Rather than change the Commission with oversight of specific instances of abuse, Congress authorized it to condition an exchange's right to register upon its enactment of rules 'just and adequate to insure fair dealing and to protect investors.' 15 U.S.C. 78f(d) (1970). And as to several specific matters inextricably linked with 'fair dealing' and 'protection of investors' from harmful or unfair trade practices, the Commission was empowered by 19(b), to order exchanges to make such amendments in their rules as the Commission found necessary to carry out the purposes of the Act.
 
 
 10
 Yet the legislative history of the Act does not simply indicate the central significance of supervised self-regulation in effectuating the purposes of the Act. Concerning the practices here challenged, we find most persuasive Congress's manifest recognition of the Commission's competence to serve the necessary antitrust objective of preserving competition, by delegating to it control over practices which, but for 19(b) of the 1934 Act, would be per se violations of the antitrust laws. Those familiar with the development of antitrust law know that seven years before the Securities Exchange Act was passed, the Supreme Court decided that price-fixing was a per se violation of the Sherman Act. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). Despite this clear holding, the 1934 Act explicitly provides for 'the fixing of reasonable rates of commission, interest, listing, and other charges.' 15 U.S.C. 78s(b)(9) (1970). Reference to the Senate hearings dispels any doubt on this score, for they make plain the congressional awareness that this provision 'would permit the Commission to fix rates.' Hearings on S.Res. 84 (72d Cong.) and S.Res. 56 and S.Res. 97 (73d Cong.) Before the Senate Comm. on Banking and Currency, 73d Cong., 1st and 2d Sess., pt. 16, at 7705 (1934) (statement of Samuel Untermyer). Moreover, the practice in the securities field of industry-wide agreement on minimum fees-- dating back to 1792, see SEC, Report of Special Study of Securities Markets, H.R.Doc.No.95, 88th Cong., 1st Sess., pt. 2, at 295 (1963)-- was repeatedly acknowledged both in committee hearings, see Hearings on S.Res. 84 (72d Cong.) and S.Res. 56 and S.Res. 97 (73d Cong.) Before Senate Comm. on Banking and Currency, 73d Cong., 2d Sess., pt. 13, at 6075, 6080-81 (1934); Hearings on H.R. 7852 and H.R. 8720 Before the House Comm. on Interstate and Foreign Commerce, 73d Cong., 2d Sess., at 423-34 (1934), and in the debates on the Act, see, e.g., 78 Cong.Rec. 8087, 8091-92, 8490, 8493-94 (1934).
 
 
 11
 We draw two conclusions from this delegation of power over exchange commission rates. By permitting so potentially harmful a practice as rate-fixing, Congress recognized that the exchange commission system bore crucially upon achievement of the goals of the 1934 Act. Further, by placing in the hands of the SEC the regulation of rate-fixing-- a practice the effects of which the Supreme Court acknowledged its inability to assess, see United States v. Trenton Potteries, supra, 273 U.S. at 398, 48 S.Ct. 377-- Congress made clear its judgment of the Commission's competence to assume the central role in assuring investor protection and exchange fair dealing.
 
 
 12
 Exemption from the antitrust laws with regard to the fixing of minimum rates of commission is not only mandated by both the language and the legislative history of the 1934 Act, and in particular 19(b)(9), but is grounded as well in sound policy considerations governing regulation of the securities industry. Of principal concern is the danger, clearly contemplated by Silver, 373 U.S. at 358, 83 S.Ct. 1246, that courts and the SEC would subject exchanges to repetitive or conflicting standards. There is little question but that the commission rate structure is the keystone of the economic viability of the brokerage industry, and a matter of vital importance to individual investors as well. Steering effectively between the often competing interests of 'seller' and 'buyer'-- reducing the barriers to investor trading, while at the same time assuring a return sufficient to preserve brokerage capacity-- becomes far too hazardous with two hands on the tiller.
 
 
 13
 Nor are the hazards of repetition and conflict in this case a matter of mere speculation, as a review of the widereaching and systematic character of recent SEC action regarding rate regulation makes evident. In 1963, following the congressional mandate embodied in 15 U.S.C. 78s(d), the SEC published its extensive Report of Special Study of Securities Markets, H.R.Doc.No.95, 88th Cong., 1st Sess. (1963), dealing among other other matters with the practice of fixing stock exhange commission rates. Recent Commission action with regard to the particular practices challenged by Gordon began in 1959, with a request to the NYSE to study the possible introduction of a volume discount. See SEC Securities Exchange Act Release No. 5889 (Feb. 20, 1959). Comment was requested on both NYSE and SEC proposals on January 26, 1968. SEC Securities Exchange Act Release No. 8239 (Jan. 26, 1968). On May 28, 1968, the NYSE was asked either to implement a suggested commission schedule incorporation volume discounts for round lot portions over 400 shares, or to eliminate minimum commissions on portions of orders in excess of $50,000, before September 15 of the same year. Public hearings, also were commenced on May 28, 1968, to determine 'changes in the present commission rate structure . . . required to benefit the investing public.' SEC Securities Exchange Act Release No. 8324 (May 28, 1968). The same release requested that other exchanges make 'appropriate' changes similar to those demanded of the NYSE. The Commission thereafter notified the NYSE that the requirements of Release No. 8324 would be satisfied by provision for a volume discount on orders in excess of 1000 shares, Letter of Manuel F. Cohen to Robert W. Haack (August 30, 1968), and on September 4, 1968, it extended the mandated effective date to December 5, 1968. SEC Securities Exchange Act Release No. 8399 (Sept. 4, 1968).
 
 
 14
 Commission approval was given on August 2, 1970, for the interim surcharge challenged by Gordon, in order 'to provide emergency financial relief while more fundamental alterations of the existing rate structure can be considered.' Approval was subject to the understanding that the surcharge would expire after 90 days, and that the NYSE would restore full brokerage services for small investors and remove transaction size and other limitations on such accounts. Letter of Hamer H. Budge to Robert W. Haack, April 2, 1970. Approval was given on similar conditions to the Amex proposed rule 396, requesting a like interim surcharge. Letter of Irving M. Pollack to Ralph S. Saul, April 10, 1970. The terms of the surcharges were thereafter extended, SEC Securities Exchange Act Release No. 8923 (July 2, 1970), and expired in March (NYSE) and April (Amex) of 1972.
 
 
 15
 The recent SEC program which aims at gradual introduction of negotiated rates strongly enforces our view that it would be unwise for a court to interfere under the antitrust laws. Although SEC Securities Exchange Act Release No. 8324 (May 28, 1968) contemplated the introduction of negotiated rates as an alternative to volume discounts, the Commission determined by October 22, 1970, that fixed charges on portions of orders in excess of $100,000 were-- even when joined with volume discounts-- neither necessary nor appropriate to achieving the purposes of the 1934 Act. Letter of Hamer H. Budge to Robert W. Haack, October 22, 1970; SEC Securities Exchange Act Release No. 9007 (Oct. 22, 1970). The Commission subsequently indicated that a $500,000 'breakpoint' would be acceptable, Letter of Richard B. Smith to Robert W. Haack, February 10, 1971; SEC Securities Exchange Act Release No. 9105 (March 11, 1971), and sent to the other exchanges copies of its correspondence with the NYSE regarding negotiated rates for their 'appropriate consideration.' Letter of Irving M. Pollack to the presidents of the American, Boston, Cincinnati, Detroit, Midwest, National, Pacific Coast, Philadelphia-Baltimore-Washington, Salt Lake, and Spokane Stock Exchanges, March 17, 1971. In its Statement on the Future Structure of the Securities Markets (Feb. 2, 1972), issued subsequent to the initiation of Gordon's lawsuit, the Commission announced its conclusion, grounded on the results of monitoring undertaken concurrently by the SEC and the exchanges, that a reduction in the breakpoint to $300,000 was appropriate, and commanded its implementation by April of 1972. Not long thereafter, SEC Securities Exchange Act Release No. 10383 (Sept. 11, 1973) decreed the end of all fixed commission rates by April 30, 1975. As a further step in the process of gradual abandonment, SEC Securities Exchange Act Release No. 10560 (Dec. 14, 1973) requested the immediate introduction of limited price competition in transactions falling below the current breakpoint.
 
 
 16
 The Commission's program of measured introduction of negotiated rates has been carefully gauged to avoid undesirable side-effects on both the industry and the investing public. The Statement on the Future Structure of the Securities Markets, 15, cautions:
 
 
 17
 We must bear in mind . . . that we are dealing with an industry which has operated under fixed commission rates for a very long time. It is necessary to measure the effect of competitively determined commissions very carefully on a step by step basis.
 
 
 18
 We are told, for example, that among the consequences certain to result from the introduction of negotiated rates across the boards is the failure of a number of inefficient brokerage firms. Baxter, NYSE Fixed Commission Rates: A Private Cartel Goes Public, 22 Stan.L.Rev. 675, 699 (1970). The SEC study revealed that the exchanges have operated for a long time under cartelized commission rates, which exceed those which would have been charged by firms of efficient scale. Thus, firms too small and inefficient to survive in a competitive market have so far been sheltered. Introduction of negotiated rates across the entire range of trades would, it is thought, cause many of these firms to go under. Baxter, supra, 22 Stan.L.Rev. at 699. Much of the damage resulting from such attrition would be borne by the investing public, to whom failing member firms would be indebted in the form of credit balances. Measured withdrawal could avoid the loss of those investor funds by allowing failing brokers to 'exit by orderly merger or liquidation rather than by bankruptcy.' Note, Fixed Brokerage Commissions: An Antitrust Analysis After the Introduction of Competitive Rates on Trades Exceeding $500,000, 85 Harv.L.Rev. 794, 811 (1972).
 
 
 19
 We have recounted at such length the Commission's actions on brokerage rate changes not solely to demonstrate the extraordinarily active surveillance by the Commission, in accordance with Congress's expressed declaration, nor even to establish that the invocation of antitrust jurisdiction would result in repetition of and conflict with SEC action. Of greater importance, it seems to us, is the reminder it offers that when something as crucial to the survival of the securities industry as its very ancient rate structure is at stake, diagnoses and changes must come from an agency with the Commission's expertise. The wisdom of the SEC's actions is, of course, not before us. We stress only that it is clear that, with respect to the fixing of commission rates, the process of administrative review in the first instance is far superior to judicial review.[8]
 
 
 20
 That Congress recognized agency superiority in this regard should not, moreover, come as a great surprise, for the courts themselves, by the time of the 1934 Act's passage had admitted as much in abandoning the rule of reason approach to price-fixing. Indeed, the adoption of a standard of per se illegality in Trenton Potteries was thought necessary by the Supreme Court to relieve the judiciary of the need to determine the reasonableness of prices set by horizontal agreement. The Court there stated:
 
 
 21
 In the absence of express legislation requiring it, we should hesitate to adopt a construction (of the Sherman Act) making the difference between legal and illegal conduct in the field of business relations depend upon so uncertain a test as whether prices are reasonable-- a determination which can be satisfactorily made only after a complete survey of our economic organization and a choice between rival philosophies.
 
 
 22
 United States v. Trenton Potteries, 273 U.S. 392, 398, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927). Such questions as the effect of fixed commission rates on trading volume and broker solvency, or the effect of competition on and the necessity for exchange membership, are not of the sort which courts can answer as well as the SEC. The statutory scheme exhibits congressional confidence that the Commission will be more capable of resolving problems of this nature.
 
 
 23
 We are not unmindful of the Seventh Circuit's decision in Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264 (7th Cir. 1970), heavily relied upon by Gordon and the Department of Justice as amicus curiae for appellant.[9] The claim there presented against the NYSE's anti-rebate rule is of a different character from Gordon's challenge to rate-fixing practices. For, as the Thill court stated, there was 'no evidence as to the extent to which the challenged rule is subject to actual review by the SEC . . .' 433 F.2d at 270. Moreover, the anti-rebate practice, not specified in any of the twelve subsections of 19(b), may not be within that core of antitrust immunity to which we have referred. But it is a fact that at the time Thill was decided, the SEC was conducting hearings into, among other matters, the 'economic access to exchange markets by nonmembers broker-dealers . . .' SEC Securities Exchange Act Release No. 8324 (May 28, 1968). And it would be difficult to maintain that the effect of the anti-rebate rule on investor protection, fair dealing in securities, or fair administration of an exchange is in any significant respect different from the practice of commission rate-fixing.[10] See Note, Antitrust Laws and the Securities Exchanges, 66 Nw.U.L.Rev. 100, 106 n. 40 (1971). Thus, to the extent our decision today is inconsistent with Thill, we find ourselves constrained to disagree with the holding there announced.[11]
 
 
 24
 We emphasize that the conclusion we reach today by no means implies that Gordon at no time may have access to the courts. After Commission action, judicial review of its decision is proper pursuant to the provisions of the Administrative Procedure Act, 5 U.S.C. 702, 704 (1970), see Independent Broker-Dealers' Trade Association v. SEC, 442 F.2d 132 (D.C.Cir.), cert. denied, 304 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1970), and, in the case of Commission orders, under the provisions of the 1934 Act, 15 U.S.C. 78y (1970). On such review, a court is competent to consider, in accordance with standards appropriate for review of agency action, see Administrative Procedure Act 10(e), 5 U.S.C. 706 (1970), the weight given by the Commission to competitive factors in achieving the goals of the 1934 Act.
 
 
 25
 For the reasons stated, we affirm the district court's grant of summary judgment and dismissal of Gordon's claim.
 
 
 26
 Affirmed.
 
 
 
 [1]
 Merrill Lynch, Pierce, Fenner & Smith, and Bache & Co., Inc
 
 
 [2]
 NYSE Const. Art. XV, 2 (1971); subsequently amended; Amex.Const., Art. VI, 2 (1971), subsequently amended
 
 
 [3]
 NYSE Rule 383 (1971), repealed April 1, 1974; Amex Rule 396 (1971), amended April 1, 1972
 
 
 [4]
 Gordon also claimed that the volume discounts were 'unreasonably low prices for the purpose of destroying competition or eliminating a competitor,' in violation of 15 U.S.C. 13a (1970). Although the district court made no finding in this regard, plaintiff does not press the point on appeal
 
 
 [5]
 The complaint also challenged rules which limited exchange membership, and which denied discounted commission rates to nonmember brokers who used exchange facilities. The district court concluded that these claims were frivolous. We agree, since 3(a)(3) of the Securities Exchange Act of 1934, 15 U.S.C.A. 78c(a) (3) (1970), clearly contemplates limitations on both exchange membership and nonmember access to exchange facilities
 
 
 [6]
 Because the district court considered affidavits and exhibits annexed as well as the pleadings, it properly concluded that the motion to dismiss should be treated as one for summary judgment. Rule 12(b), F.R.Civ.P
 
 
 [7]
 We agree with the district court that there is no precedent for the assertion that brokerage services are 'commodities' within the meaning of the Robinson-Patman Act, 15 U.S.C. 13(a) (1970)
 Gordon raises on appeal for the first time the claim that the combination of surcharges, volume discounts, and negotiated rates violates 15 U.S.C. 13(c) (1970), as an allowance or commission not granted for services rendered. Although we decline to entertain the claim because it was not raised in the district court, we note that 13(c) proscribes such practices only 'in connection with the sale or purchase of goods, wares, or merchandise . . ..'
 
 
 [8]
 By this we do not intend to imply that withdrawal of antitrust jurisdiction is based on the SEC's 'primary' jurisdiction over the practices challenged by Gordon. Cf. Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264, 276-277 (7th Cir. 1970) (Swygert, J., concurring). As our earlier discussion of the language and history of the 1934 Act indicates, we are of the view that Congress intended to exempt commission rate-fixing from the operation of the antitrust laws, and consequently deprived the courts of even 'secondary' jurisdiction to entertain Sherman Act claims like that which Gordon asserts. Judicial review of SEC action would, however, be proper, either under the Administrative Procedure Act, 5 U.S.C. 702, 704 (1970), or pursuant to the provisions of the 1934 Act, 15 U.S.C. 78y (1970)
 
 
 [9]
 The SEC has also filed a brief as amicus curiae for the appellees
 
 
 [10]
 As such, it would appropriately fall within the rule which we today announce, under the language of 19(b)(13), 15 U.S.C. 78s(b)(13) (1970) ('similar matters')
 
 
 [11]
 Judge Campbell in Thill relied heavily upon United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) for the proposition that implied exemption from the antitrust laws was a fortiori improper on the facts before the court. 433 F.2d at 272. In Philadelphia National Bank the Court held that, despite the congressionally required approval of the Comptroller of the Currency, pursuant to the Bank Merger Act of 1960, 12 U.S.C. 1828 (1970), a merger between the Philadelphia National Bank and Girard banks remained subject to antitrust action by the Department of Justice
 Although we are not unmindful of the disfavor with which antitrust exemption is generally regarded, see, e.g., California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962), we perceive significant differences between Philadelphia National Bank and the case which we today decide. We note that the history of the Bank Merger Act evidenced a congressional intent not to immunize bank mergers from at least Sherman Act attack, see 374 U.S. at 352, 83 S.Ct. 1715, whereas the 1934 Act entrusts the SEC with supervision of ratefixing, a practice which outside the confines of the 1934 Act is a per se violation of the Sherman Act. Cf. Silver v. New York Stock Exchange, 373 U.S. at 347-349, 86 S.Ct. 1246 (recognizing that a group boycott carried out within the framework of the 1934 Act is not a per se antitrust violation).